Benson ANABLE; Laura Balch; and Dan Pless, Individually and as Father and Next Friend of Matthew Pless, a Minor, Plaintiffs,

v.

James H. FORD, Individually and In His Official Capacity as Superintendent of the Arkadelphia School District; and Mary Francis, Kenneth Harris, Floyd Manning, Don Pennington, and Michael V. O'Quinn as Individuals and In Their Official Capacity as Directors of the Arkadelphia School District; and the Arkadelphia School District, Defendants.

Civ. No. 84–6033.

United States District Court,
W.D. Arkansas,
Hot Springs Division.

July 15, 1985.

Clayton Blackstock and Robert M. Cearley, Jr., Cearley, Mitchell & Roachell, Little Rock, Ark., for plaintiffs.

Ed W. McCorkle, McMillan, Turner & McCorkle, Arkadelphia, Ark., and Robert V. Light, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. Introduction

This action is brought pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), for claims allegedly based upon violations of plaintiffs' Fourth and Fourteenth Amendment rights, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek damages, injunctive and declaratory relief.

Plaintiff, Dan Pless, is a 12–year-old student currently enrolled in the Arkadelphia, Arkansas, public school system. Plaintiffs, Benson Anable and Laura Balch, are former students of Arkadelphia High School.

Defendants are the Superintendent and members of the board of directors of the Arkadelphia School District and the Arkadelphia School District.

All plaintiffs challenge substantive and procedural aspects of Arkadelphia School Board Policy JCDAC–STUDENT DRUG ABUSE ("Policy") which was implemented in August, 1982. Plaintiffs Anable and Balch "withdrew" from school with loss of all credit acquired during the pending semesters as a result of the enforcement of the policy. Plaintiff Anable was withdrawn from school for an additional semester as well. Plaintiff Pless has not been disciplined under the policy nor has he been accused of violating its provisions. He alleges, however, that he labors under the *threat* of its enforcement and that constitutionally protected conduct is thereby "chilled."

### II. Policy Provisions

The current draft of the policy provides, *inter alia*, the following:

Sale, distribution, use or possession of alcoholic beverages, controlled substances, (illegal drugs), marijuana, or other materials expressly prohibited by federal, state, or local laws is not permitted by students in school buildings, on school property, or at school functions. Also, the sale, distribution or abusive use of prescription, patent or imitation drugs is not permitted. *A trace of illegal drugs/alcohol in one's body is a violation of this policy* (emphasis added).

Violation of this policy *will* result in the following consequences:

1. When possible, the parent/guardian will be notified.
2. The law enforcement agency will be notified of any criminal activity and school officials will cooperate fully.
3. The student may be *required* to submit to any or all of the following tests:
 a. Blood
 b. Breath
 c. Urinalysis
 d. Polygraph

(emphasis added).

. . . .

A student may be searched where there is reasonable suspicion that the student may be hiding evidence of a *wrongdoing* (emphasis added).

. . . .

Due process will be observed in the administration of this policy.

"Drug" is defined in the policy as:

Any chemical that in sufficient amounts will alter a person's ability to function *normally* on a mental or physical task. Drugs include, but are not limited to, alcohol, controlled substances, hallucinatory drugs, marijuana, glue, paint, or materials expressly prohibited by federal, state or local laws (emphasis added).

"Possession" is defined as including:

... having the drug on the person, or in the immediate vicinity of the person or

among the personal possessions (locker, car, etc.) of the individual.

"Abusive use" is described as:

The taking of more or less of a drug than what is prescribed so as to alter the person's ability to function *normally* on a mental or physical task (emphasis added).

The penalty for the first violation of the policy, for students enrolled in grades five through twelve, is as follows:

... the student will be permitted to withdraw from school for the remainder of the semester with loss of *all* (emphasis in original) credit for the semester. If the student does not withdraw, the school board *will* (emphasis added) expel the student for the remainder of the semester with loss of *all* credit (emphasis in original).

Earlier drafts of the policy stated that students may be "asked" to submit to any of the four tests. The final draft substituted the word "required" for "asked" in order to "toughen" the policy.

The adoption of the policy was, at least partially, in response to a drug-related double murder of two young people who had been students at Arkadelphia High School. School officials ascertained that drug problems at the school were typical as compared with similar school systems.

### III. Facts and Testimony

#### (a) Laura Balch

The sanctions of the policy were imposed upon plaintiff Balch during the fall semester of 1982.

On Friday, October 22, 1982, plaintiff Balch and her friend, Faye Gleason, obtained permission to leave their third period Physical Education class to go to the girls' restroom. They testified that when they entered the restroom they discovered Stephanie Malone, a cheerleader, brushing her hair. Stephanie was preparing for a pep rally which was scheduled for the next period.

At this point the testimony diverges somewhat. Stephanie testified that Balch and Faye Gleason were exiting the restroom when she arrived. Plaintiff Balch and Faye Gleason testified that they smelled marijuana smoke in the restroom when they entered. Both testified that Faye Gleason wanted to leave immediately because of the smoke. Plaintiff Balch said that she had insisted on utilizing the facilities before leaving. Both denied smoking marijuana in the restroom.

Stephanie Malone, on the other hand, testified that she had seen two black girls, of which plaintiff Balch was one, in the restroom and that one of them had a marijuana cigarette in her hand and later flushed a commode.

After plaintiff Balch and Faye Gleason left the restroom, other cheerleaders arrived and "joked" about the marijuana smoke. Two cheerleaders told their cheerleader sponsor, Diana Roberson, that someone had been smoking marijuana in the restroom. Roberson informed the principal and they proceeded together to the restroom. Roberson instructed the cheerleaders to leave and both Roberson and the principal confirmed the presence of marijuana smoke.

The principal instructed all teachers to submit lists of all students who had left class during third period. It was ascertained that Stephanie Malone, Faye Gleason and plaintiff Balch could have been in the restroom. All three were interviewed separately. Stephanie Malone stated that either Faye Gleason or Laura Balch had a "joint" in her hand in the bathroom. She further stated that plaintiff Balch had asked her not to report what she had seen and she promised she would not. Both plaintiff Balch and Faye Gleason denied smoking any marijuana. They were not told by school officials that Stephanie Malone had, in fact, "informed" on them. Principal Green said that none of the three girls exhibited any symptoms of marijuana use, although the questioning occurred shortly after the restroom incident. Stephanie's report was the sole basis for suspecting Balch at this time.

During the questioning of plaintiff Balch, Superintendent Ford was present with a tape recorder. Principal Green told plaintiff Balch that she was suspected of violating the policy, but "could" undergo an urinalysis test to prove her innocence.

No search of persons, lockers, cars, or purses was requested by school officials, and apparently was not considered as an alternative applicable to the resolution of this incident (testimony of Principal Green).

Although the policy provides that students may be *required* to undergo such a test and that any "trace" of marijuana discovered will result in withdrawal or expulsion, Principal Green testified at trial that there was insufficient evidence to warrant sanction unless Stephanie Malone would publicly admit her accusation of plaintiff Balch and Faye Gleason. At that time, Stephanie Malone said she was afraid to do so. All three students testified that they were told they "had" to take the test.

When plaintiff Balch was questioned it appears that Superintendent Ford, who was present, considered refusal to submit to a test to be a violation of the policy (see Plaintiffs' Exs. 2 and 3, Defendants' Ex. 2). At trial defendants contended that the tests were "optional" with the student and that the results would be considered "conclusive" only if a negative test result was obtained. However, Principal Green testified that had one of the girls refused the test, it may have caused him to believe the guilt of the student. At no point was Balch advised of a right to counsel.

All three students "agreed" to take the tests. Under the circumstances, however, because it was late on a Friday the tests were scheduled for the following week.

The evidence is unclear as to whether school officials truly suspected Stephanie Malone of smoking marijuana, or rather, in order to preserve the confidentiality of Stephanie's communication, requested that she and her father consent to the test. Stephanie testified that she was told she "had" to take the test. She also said that she was "supposed" to take it to show that she may have been "in on it," too.

"Consent" was eventually obtained from parents of plaintiff Balch and Faye Gleason, and the tests were conducted on the following Tuesday. Each was separately escorted into the girls' restroom by a female staff member. The girls were required to squat in the open and to urinate into a vial so that the staff member could verify that the sample was genuine and not dipped from the toilet. There was some spillage and the tube had to be wiped off in at least one case. All three students testified that they felt extremely embarrassed and humiliated by the test.

Plaintiff Balch testified that she had smoked marijuana at home during the week before the test, including the Thursday night prior to the incident. Both plaintiff Balch and Faye Gleason testified that they smoked marijuana on the way to a football game in Malvern on Friday evening following the incident. Faye said that she had not smoked marijuana before, but did so because she had already gotten into "trouble" at school. The students were told not to smoke marijuana during the weekend.

Plaintiff Balch's father advised her that drinking vinegar would cause the test results to be negative. She stated that she did not believe this, but admitted that she did drink vinegar during the weekend because, "I like vinegar." No testimony indicated that any of the three girls exhibited any of the classic symptoms suggestive of recent marijuana use, such as redness of the eyes or dryness of the mouth.

The test utilized was the Emit immunoassay for metabolites of marijuana constituents. According to Dr. Raymond Harbison, a Board Certified Toxicologist who testified via affidavit pursuant to stipulation, the Emit immunoassay for metabolites is the least expensive test available for the detection of marijuana use. This test detects the presence of marijuana or similar metabolites only at levels of 50 nanograms of constituent per milliliter or above. Any chemical substance similar in chemical makeup, such as steroids, can produce a

false positive result. None of the urine tests can detect the quantity of the psychoactive ingredient, tetrahydrocannabinol, in the blood. Therefore, the pharmacological effects on the user cannot be evaluated. Additionally, the urine tests can detect some traces for weeks after ingestion. The presence of the active ingredient, delta-9-tetrahydrocannabinol, cannot be detected at all. According to Dr. Harbison, some marijuana contains no psychoactive ingredient and will therefore not psychoactively affect the user. The immunoassay cannot separate the pharmacologically active constituents from other constituents, although the other urine tests can. Differences in frequency of use, metabolism of the user, quality of the marijuana, amount used, excretory capacity, and elapsed time can result in a negative result in the case of one person and a positive result in the case of another, although they both have used equal amounts of marijuana recently. A single urine sample analyzed by immunoassay for marijuana constituents cannot establish the time of use, the amount of use, or the pharmacological effects on the user.

The results of the Emit immunoassay tests for metabolites were received by the school on Friday, October 29, 1982. Plaintiff Balch's test was positive, while the tests of Faye Gleason and Stephanie Malone were negative. Based on these results, Stephanie Malone and Faye Gleason were "exonerated" and plaintiff Balch "withdrew" from school by signing a withdrawal form, thereby losing all credit for the fall semester of 1982. By withdrawing, plaintiff Balch avoided possible expulsion by the school board. Superintendent Ford admitted, however, that Balch would not have been expelled or asked to withdraw in the absence of the positive test results without Stephanie's coming forward.

### (b) Benson Anable

Plaintiff Anable's entanglement with the policy began on the evening of December 7, 1983. He and his stepbrother, Robbie Ezell, gathered with other friends at the riverbank in Arkadelphia. Most drank beer and passed a bottle of liquor among them. The next morning plaintiff Anable and Robbie Ezell woke up about 6:00 a.m. to get ready for school. Anable testified that he drank a portion of one beer to reduce the effect of his "hangover." Robbie Ezell mixed a drink of liquor and consumed it prior to school. Anable testified that they had spilled a part of bottle of liquor on his clothing, but that he had not consumed any that morning.

Prior to class, plaintiff Anable saw Principal Green and discussed Anable's class attendance. Principal Green made no comment to anyone regarding any apparent intoxication of Anable. Anable proceeded to class and arrived on time. There was testimony indicating that Anable was boisterous in class that morning. There was also some evidence that Anable was boisterous in class all of the time. In any event, Anable failed to sit in his assigned seat. Having misplaced his book, he chose to share a book with a female friend whose boyfriend had been with Anable on the prior evening. He was directed to return to his seat.

Near the end of class, Anable observed his stepbrother making "faces" through the classroom window and acting in a generally irresponsible manner. Anable asked for permission to leave to take care of his stepbrother. Permission was denied. Anable wrote a note to the teacher explaining why he felt he needed to leave class. However, after Anable told his teacher it was important that he be allowed to leave, he was still denied permission. He left the classroom without permission and took his stepbrother into the restroom. Anable's instructor reported the incident to Principal Green. She testified that she noticed no indication of intoxication, but noted that Anable was "disruptive."

Vice Principal Lloyd Brite came into the restroom to ascertain whether either had a hall pass. Because they did not, Brite sent the boys to his office.

Numerous school personnel, including Superintendent Ford, Principal Green and Coach Outlaw, talked to the boys. It was

evident that Anable's stepbrother had been drinking alcohol. Finally, Superintendent Ford told the boys that they smelled of alcohol and were considered to be in violation of the policy. By this time a Seven-Up bottle smelling of liquor had been found in the vehicle in which the boys rode to school. Vice Principal Brite later told Anable's mother that the boys were "in no condition to stay in school."

At trial, Anable, Principal Green and Coach Outlaw testified that Anable was told that he could withdraw, be expelled, or take a breathalyzer test at police headquarters. Unlike the situation with plaintiff Balch, Principal Green stated that Anable would have been expelled or compelled to withdraw had he refused the test. As noted, with regard to plaintiff Balch, the school officials indicated that they would not have expelled Balch without the test results.

Dr. Ford testified that of the 17 students suspected of violating the policy, some would not have been expelled or asked to withdraw without a positive test result. However, with regard to Anable, the testimony indicated that the school officials would have had him expelled or compelled him to withdraw had he not taken the test. Principal Green stated that he would consider a refusal to submit to the test as an indication of guilt.

Although both boys initially refused the test, plaintiff Anable later agreed, with the approval of his mother, Patzy Ezell, a teacher at another school. Anable stated that he finally agreed to the test because he was told that he would be removed from school if he refused and because he thought he could "pass" the test.

Anable "consented" in writing to the test. The test registered a blood alcohol content of .06 percent. Anable said that he thought any reading of less than .10 percent was a "passing" result and did not understand that a "trace" meant "any measurable amount."

Plaintiff Anable was then told he must withdraw or face expulsion. Anable testified that he was told that the School Board always upholds a recommendation for expulsion. Believing this to be true, Anable agreed to withdraw.

As evidence that the school board "always" upholds such recommendations, Anable related an incident wherein he had been suspended for five days because of a violation of the tobacco policy. According to Anable, Vice Principal Brite hid in the woods with a camera and binoculars and took a photograph of Anable purportedly smoking a cigarette. Anable had the photograph enlarged and related that the enlargement showed him to be eating a candy bar. He contends that ten witnesses were present to verify that the item shown in Vice Principal Brite's photograph was not a cigarette. Anable said that the school board would not look at his enlargement or listen to the witnesses. Anable also said that he was unaware of any instance wherein the school board had rejected a recommended disciplinary measure.

After the breathalyzer test, everyone returned to the school to complete the proper paperwork. Before it was completed, however, Anable exchanged words, including some profanity, with Principal Green and was observed smoking a cigarette on the school property. He had been talking to his girl friend about the events of the morning. Anable was told two or three times to put out the cigarette. Based upon Anable's conduct after returning to school, school officials recommended an additional semester of suspension. At one point he had jerked away from Principal Green. According to Principal Green, Anable's mother, a school teacher in another public school system, later told Principal Green, "I don't see how you kept from hitting him."

The withdrawal form signed by Patsy Ezell, Anable's mother, was the one used for drug policy withdrawals. It is not normally used for other types of withdrawals. It provided that Anable was to be withdrawn for two semesters. Ezell said she did not read the form and was not informed that the additional semester of exclusion was sought. Plaintiff Anable said he never

saw the form. Anable's mother related that she did not intend to withdraw Anable for more than one semester and was not aware that the school claimed otherwise until she tried to enroll him for the following semester. School officials contend that both Anable and his mother were aware of the additional semester's withdrawal. At the time of withdrawal, Anable was given copies of the drug policy, expulsion policy, and smoking policy.

Anable stated in deposition that he had briefly discussed the possibility of going before the school board with his mother. At trial he did not specifically recall discussing it, but acknowledged that he was aware of the possibility. He stated, however, that he was repeatedly told by Principal Green that it would not accomplish anything because his recommendation was unfailingly upheld.

All acknowledge that plaintiff Anable is a bright and intelligent student, and was attending college part-time at the time of the incident. Because no other high school would accept him after the incident, Anable took the G.E.D. examination, scoring above the 94th percentile, and thereby obtained a high school equivalency certificate. It is not disputed, however, that Anable was boisterous by nature and that his behavior had brought him to the attention of school officials and other authorities on previous occasions.

Anable testified that the additional suspension was mentioned by Principal Green, but that he (Anable) did not understand that he was expected to withdraw for the additional period. He believed that the school may have intended to unilaterally seek sanctions which he was prepared to contest.

Anable's mother testified emphatically that she was led to believe that Anable was to be withdrawn for only one semester. There was some confusion because Principal Green's office had lost or misplaced the original form. Green sent her another one which she signed without reading in haste in the office of the principal of her school where she was summoned from her class

of students with behavioral problems. She further testified that she, too, believed that a board hearing would have been pointless, also citing the board's failure to consider the evidence regarding the prior smoking violation. Although Anable was eventually given copies of the drug, tobacco and expulsion policy, Superintendent Ford testified that there is no need to let students read them prior to a drug or alcohol test.

### (c) Matthew Pless

Plaintiff, Matthew Pless, is a 12–year-old student in the Arkadelphia School District. He has never been accused of violating the drug/alcohol policy. He alleges that he is "threatened" by the policy because he has and will engage in conduct that would subject him to the sanctions of the policy.

He related that in November, 1984, he was "depressed" because his father, Dan Pless, had told him that they were going to move out of the country because President Reagan would be, or had been, re-elected. He took this statement literally and took a Nytol tablet before school. After dozing in class, his teacher sent a note home advising Matthew's parents that Matthew needed more sleep. Additionally, Matthew's father allows him to drink one glass of "watered-down" wine at home with meals on occasion. By taking a drug that affected his ability to perform "normally" at school, and by ingesting alcohol which may leave a "trace" of the same in his blood, Matthew alleges that his conduct has been and will be in violation of the policy. Although Matthew's version of events has varied somewhat in response to pretrial motions, the court will accept the "facts" as currently expressed by Matthew to be true. Specifically, as defendants' attorneys raised certain defenses during the pre-trial stage, Matthew's "story" seemed to change to meet them.

### IV. Background and Implementation of the Policy

In the August 17, 1982, regular session of the scheduled school board meeting, the policy was adopted as submitted by the school administration with the exception of changing item 3, page 1, to read: "3. The

student may be *required* to submit to any or all of the following tests," substituting "required" in place of "asked," in order to "toughen" the policy.

On September 1, 1982, a meeting was held at which Superintendent Ford, principals and counselors, defendants' counsel, law enforcement officials, and Kathleen Kline, the drug abuse program coordinator, were present to discuss legal aspects of the new policy. With regard to the "trace" issue, it was decided that tests to determine "traces" of drugs or alcohol would be performed only in cases where external evidence and overt behavior of the student determine the "need."

With regard to the urinalysis tests, it was decided that such tests would be administered by the high school. Parents were either to be present or to give their consent prior to such testing.

As to the breathalyzer, it was noted that this could be performed at the police department without the presence or permission of a parent. With regard to "field tests," it was mentioned that a "straight line" test could be used, "slurred speech" could be considered, the school nurse was to be called, and " 'unusual behavior' when compared to last few weeks" was to be evaluated.

In this meeting those present were directed not to force the students to take the tests, but only to "encourage" them to do so. Those present decided that accused students could stay in school pending the test results unless there was "overt behavior" indicating the influence of drugs or alcohol.

The most telling aspect of this meeting, however, is that it was clearly resolved that "if a student refuses to take test for drugs *they have violated the policy.*" (Plaintiffs' Ex. 2, Minutes of Meeting Dated September 1, 1982, p. 2, # 6(f) (emphasis in original).

On November 3, 1982, Superintendent Ford issued a supplementary memo to the administrative team, board of education. This memo reaffirmed earlier discussions

of the policy and clarified aspects of polygraph testing.

According to Superintendent Ford, the "final word" on the policy was the "To Whom It May Concern" letter, admitted as Plaintiffs' Exhibit 4. It makes clear that students can be taken to the police department for breathalyzer testing without consent of either parent. It also provides that parents could have students tested by urinalysis for marijuana or other drugs upon request.

The letter states that "tests will be given only in cases where external evidence determines the need." This "need" was defined as including situations where "a student is not functioning normally or we detect the odor of alcohol, marijuana, etc.," and "if the student's behavior is unusual when compared to the last few weeks." Students were to be allowed to stay in school pending test results "unless the behavior is so overt that he/she cannot function properly."

Defendants' Exhibit 6 is a tabulation of 17 students accused of violating the policy. Seven students have been accused of violating the provisions relating to use or possession of alcohol. None of the students other than plaintiff Anable have ever been tested for an alcohol violation. Of the other six, five withdrew without a test and one was expelled without a test. Only Anable and Robbie Ezell have been charged with *use* of alcohol. Ezell withdrew without a test and Anable withdrew after a "positive" test result. As noted, only Anable has been tested by breathalyzer.

Ten students have been accused of violating the provisions relating to the use or possession of marijuana. Unidentified Student # 9 was accused of possession of marijuana and tested by urinalysis. Despite a "negative" test result, the student withdrew. Two other students accused of possession of marijuana were not tested but withdrew.

Seven students have been accused of using marijuana. All were tested. Three students had "positive" test results. Two of those withdrew and one was expelled.

Of those charged with use of marijuana, four had negative test results and all four remained in school.

Of the four persons who were allowed to remain in school, none appeared before the school board. With regard to the two students expelled, the school board followed the recommendation of the principal or superintendent. According to Superintendent Ford, the board has never found anyone not guilty.

Superintendent Ford also said that any student who is charged with a violation of the policy is told of the evidence against him or her and what the recommendation to the school board would be. He stated that no one has been expelled because of a refusal to take a test, because no one has been "told" to take one. Thus far, he maintains, the school has "allowed" students the "opportunity" to take the tests in those cases where it was already determined that there was sufficient evidence to justify expulsion. All accused students who were not tested have withdrawn or been expelled.

In deposition Dr. Ford had testified that the test results would be accepted as conclusive, whether positive or negative. One student was accused of being in violation of the policy because of low grades, recent inattentiveness, and antisocial behavior. There had been a rumor that the student had some experience with drugs. Dr. Ford felt that this was sufficient to justify removal of the student from the school system, based upon the policy, without other objective observation or confirmation. Fortunately for the student, a test was taken and the results were negative. The student was therefore allowed to continue his education.

With regard to the policy implementation in Balch's case, Principal Green said that he was waiting for the test results before he decided what his recommendation would be. He admitted that he never told Balch all of the evidence against her before the testing was mentioned. He stated, as noted above, that a refusal to take the test may have caused him to assume the guilt

of the student refusing. This "dovetails" with the testimony of Stephanie Malone, Faye Gleason and plaintiff Balch that they were told they "had" to take the test. Faye testified that the policy was read to her by Mr. Brite at the time of her questioning. The policy on its face, as read to her, indicates that students could be "required" to submit to the test.

Coach Outlaw testified that plaintiff Anable and Robbie Ezell were told they could either take the test or withdraw from school. Failure to withdraw or take the test would have led to expulsion. However, as with plaintiff Balch, Dr. Ford admitted that some of the persons who have been removed from school because of the policy would not have been removed without a positive test result.

The above is a summary of testimony and exhibits pertaining to the background and implementation of the policy and its specific application to the individual plaintiffs. Conflicts and ambiguities in the testimony and documentary evidence will be resolved below.

## V. Discussion

### (a) The Claim of Matthew Pless

Matthew Pless has alleged that the policy is unconstitutionally vague, impermissibly overbroad, violative of procedural due process, and that the blood, breath, urine, and polygraph tests are incompatible with the Fourth Amendment, both as applied and on the face of the policy. Defendants' initial objection to Pless' claim is based upon Pless' lack of standing to raise these issues.

It is, of course, fundamental that a plaintiff must allege such a personal stake in the outcome of a controversy as to warrant the invocation of federal court jurisdiction and to justify exercise of the court's remedial powers. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). While this oft-quoted phrase provides no guidance to those seeking to analyze a standing issue in any particular case, it is clear that a federal court's jurisdiction may be invoked only when the plaintiff himself has suf-

fered some threatened or actual injury resulting from the putatively illegal action. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

The injury alleged must be "distinct and palpable," *Gladstone, Realtors v. Village of Bellwoon,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and not "abstract," "conjectural," or "hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The injury alleged must be fairly traceable to the challenged action, and the relief sought must be likely to result from a favorable decision. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

Federal courts may exercise power "only in the last resort, and as a necessity," *Chicago & Grand Trunk R. Co. v. Wellman,* 143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176 (1892), and when the dispute is one "traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

An asserted right to have the government act in accordance with law is not, *per se,* sufficient to confer standing on a plaintiff. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

Thus, the general requirements for standing are that (1) plaintiff has alleged an actual or threatened injury as a result of the conduct of the defendant, (2) the alleged injury must be fairly traceable to the defendant's action that is challenged, and (3) the injury alleged must be likely to be redressed by a favorable decision. *See Arkla Exploration Co. v. Texas Oil & Gas Corp.,* 734 F.2d 347 (8th Cir.1984).

█ It is well settled that one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is sufficient. *See Babbitt v. United Farm Workers,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Where facial overbreadth is alleged, it has been held that where those whose conduct is not personally attacked stand to lose by the outcome of another's controversy but have no effective avenue of preserving their rights themselves, the parties may validly raise those rights. *See Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). This is particularly true with regard to cases involving free expression, *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), and rights of association, *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). However, where conduct rather than speech is involved, the overbreadth must be both real and substantial. Such a facial challenge is allowed only where the challenged action of defendants reaches a substantial amount of constitutionally protected conduct. *See Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

Although the Fourth Amendment safeguards the rights of those who are not directly acted upon as well as the rights of those who are, *Kolender,* 461 U.S. at 362, 103 S.Ct. at 1860, where a case-by-case scrutiny can adequately vindicate the Fourth Amendment rights of individual persons, a vagueness attack is viewed with somewhat less favor by the courts. *Kolender,* 461 U.S. at 368, 103 S.Ct. at 1864.

Matthew seems to attack, on overbreadth and vagueness grounds, various terms of the drug policy, including "possession," "other materials expressly prohibited by federal, state, or local laws," "trace," "reasonable suspicion," "illegal drugs," "patent or imitation drugs," and "wrongdoing."

█ Although it would appear that the "knowing" possession of the prohibited substances would be required in order to impose sanctions and that the term "wrongdoing" arguably fails to sufficiently define what conduct is prohibited, *see Kolender,* 461 U.S. at 357, 103 S.Ct. at 1858, no one involved in this action has been accused of, or threatened with sanctions because of, unknowing "possession" or committing a "wrongdoing." Therefore, that "concrete adverseness" upon which the court so largely depends for the

"sharpening" of issues, is lacking. *See Arkla Exploration Co. v. Watt,* 548 F.Supp. 466 (W.D.Ark.1983).

Matthew alleges only that he once took a "Nytol" capsule or tablet and became sleepy at school. No sanction under, or even mention of, the policy was forthcoming. He does not allege that he will continue to take Nytol or any other drug that will affect his ability to function at school. His sole remaining factual allegation is that once a month he is allowed to drink one glass of wine that is mixed 50 percent with water. This allegation is insufficient to raise even the mere possibility that a "trace" of alcohol would remain in his system by the time that school opens the following morning. Whether it would or would not be detectable the following morning, and if so, whether it would be noticeable, and if so, whether the school would seek sanctions, are matters of the purest speculation and conjecture.

There is no allegation that Matthew Pless or his father have committed a criminal offense or violation of rules by engaging in this conduct. Under Ark.Stat.Ann. § 48–903, Matthew's father is entitled to serve wine to minor members of his family. According to Ark.Stat.Ann. § 48–903.1, alcohol in the body of a minor does not constitute an offense. There is no allegation that Matthew has or will appear in any public place, including school, "manifestly under the influence of alcohol," *see* Ark. Stat.Ann. § 41–2913, or even "slightly" under the influence.

Thus, although Matthew and his father have a legal right to engage in the conduct alleged, there is not the slightest shred of proof that the school seeks to proscribe such conduct in any manner by enforcement of the policy.

Therefore, Matthew does not have a personal stake in the outcome of this controversy. He stands to lose nothing, even should the court uphold the challenged policy *in toto*. There is no actual or threatened injury to Matthew resulting from the policy. Any injury is purely speculative and hypothetical. With regard to Matthew, there is no "necessity" for the court to rule on the issues. Matthew has effective avenues in which to raise these issues should the need arise. The policy at issue does not purport to reach any of Matthew's alleged conduct. Case-by-case scrutiny can adequately vindicate the Fourth and Fourteenth Amendment rights he asserts.

Accordingly, the court concludes that Matthew Pless does not have standing to challenge the policy at issue. Plaintiffs' complaint, insofar as Matthew Pless is concerned, is dismissed.

### (b) The Claim of Benson Anable

Plaintiff Anable argues that the blood, breath, urine, and polygraph tests are unreasonable in the school setting under any circumstances, and alternatively, if they are permissible under some circumstances, the proper standard for utilizing the tests is one of probable cause plus a clear indication that further evidence will be found. Additionally, he argues that parents cannot give third-party consent to search their children by one of the chemical testing methods, and that his consent was ineffective. Anable further asserts that the policy on its face violates procedural due process and that his suspension for the spring semester violated procedural and substantive due process. His final argument is that the policy fails to put students on sufficient notice of what conduct is prohibited.

Because Anable was subjected only to the breathalyzer test, the court will confine its focus to that test.

In *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (U.S.1985), the Supreme Court, for the first time, held that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches of students conducted by school officials. *T.L.O.,* 105 S.Ct. at 738. The court held, however, that school officials need not obtain a warrant before searching a student who is under their authority. The school setting requires some modification of the level of suspicion of illicit activity needed to justify a search. *T.L.O.* at 742.

In *T.L.O.* the court said that "the accommodation of the privacy interests of school children with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause...." The legality of a search of a student, the court said, should depend simply on the reasonableness, under all the circumstances, of the search.

In determining the reasonableness of any search, a twofold inquiry must be made: "First, one must consider 'whether the ... action was justified at its inception' ...; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *T.L.O.* at 742.

Ordinarily, a search of a student by school officials will be "justified at its inception" where there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating the law or the rules of the school. *T.L.O.* at 742–44. The search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.* at 744.

The Supreme Court in *T.L.O.* authorized the search of a student's purse. A teacher had reported that T.L.O. had been smoking in the lavatory. This provided "reasonable suspicion" to believe that T.L.O. had cigarettes in her purse. A search of the purse for cigarettes revealed evidence that T.L.O. had been dealing in drugs.

In this case, however, we are not presented with a search of a person, clothing, personal belongings, or the immediate vicinity of a student. Nor are we concerned with inspection of lockers, desks or other school property provided for the storage of school supplies. *See T.L.O.* at 741 n. 5. With regard to plaintiff Anable, we are concerned only with the search of his breath, by breathalyzer machine, to determine his blood alcohol content.

The court is unaware of any "breathalyzer" cases on point, in which any court has determined the applicable standard governing under what circumstances an accused can be required to submit to such a test. This is, at least partially, because most, if not all, states have enacted statutes which provide implied consent to such tests by motor vehicle operators. *See, for example,* Ark.Stat.Ann. § 75–1045. Generally, under state criminal laws, however, searches of body cavities, bloodstreams, or subcutaneous tissues may nonetheless be made only if there is a "strong probability" that such a search will disclose evidence related to the offense with which one is charged, where a delay would result in the destruction of such evidence. Such a search must, however, be "reasonable," considering the seriousness of the offense and the nature of the invasion of the person. *See* Ark.R. Crim.P. 12.3(a)(i), (ii), (iii).

This is the constitutional rule as well in ordinary criminal cases. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In criminal cases not involving searches by school officials of students, *Schmerber* requires not only probable cause that the offense has been committed, but also a clear indication that the evidence relating to the offense will be found in the blood, body cavity, or subcutaneous tissue. *See Schmerber* at 770, 86 S.Ct. at 1835.

The interplay of *T.L.O.* and *Schmerber* is unclear. Certainly *T.L.O.* mandates that there be at least reasonable suspicion that a student has used alcohol while at school or is under the influence of alcohol at school, before a breathalyzer test could be required of a student by school officials. Mere possession of alcohol would not, of itself, indicate that alcohol is present in the blood or breath, and in those cases it would appear that a breathalyzer test could not be mandated over objection of the student.

However, for the reasons set forth below, this court need not decide whether a higher standard than reasonable suspicion

is required. Similarly, the court need not decide the constitutionality of the "trace" provision of the policy with regard to Anable. All of the evidence adduced at trial indicated that Anable was repeatedly told that he could withdraw, be expelled, or take the breathalyzer test. If he had "passed" the breathalyzer test, all of the school officials indicated that Anable would have been allowed to remain in school. That is what Anable believed as well. It was not disputed that Anable was informed that the school officials had sufficient evidence to justify withdrawal or recommend expulsion prior to the test. No one testified that Anable was *required* to take the test. The evidence justified school officials in believing that Anable was sufficiently under the influence of alcohol as to alter his ability to function on a physical or mental task.

Principal Green testified that he noticed an "odor" of alcohol on Anable's breath during their brief discussion before school. Although this would not in itself lead one to reasonably suspect that Anable had consumed alcohol while at school or was under the influence of alcohol sufficiently to impair his physical or mental functioning, other evidence of Anable's conduct provides such a justifiable inference. Anable's first period teacher testified that Anable was disruptive in class. Coach Outlaw, Principal Green and Superintendent Ford all testified that they carefully and at length observed Anable's behavior and demeanor, and in their opinion, Anable was under the influence of alcohol sufficiently to impair his ability to function.

▮ The court believes that Principal Green and Superintendent Ford would, in fact, have recommended expulsion, based upon the evidence at their disposal, prior to any mention of the breathalyzer. The court further believes that there was a sufficient factual basis for such action. This court may not have agreed with the school officials, but this court was not present and must give due deference to the actions of the school officials so long as there is a factual basis for so doing.

Further, because Anable registered .06 percent blood alcohol content when tested, it is clear that the test found more than a mere "trace" present. A .06 percent reading is not a wholly insignificant amount. Therefore, Anable is in no position to contend that expulsion based upon a "trace" reading is unconstitutional. The .06 percent reading casts serious doubt on Anable's contention that he had only consumed part of one can of beer some hours previously. The school officials were entitled to consider plaintiff's untruthfulness and the .06 percent reading along with the other evidence in their possession, in formulating their position with regard to Anable.

The dispositive reason, however, why the breathalyzer test poses no constitutional problem is that plaintiff freely executed a valid consent to the procedure. His mother had also given her consent. Anable's written consent states clearly "Mr. Green, I will take a breathalyzer test. You have my consent and my mother's consent."

Anable was not misled. He was told what the evidence was and that the officials would expel him or allow him to withdraw. The officials did not draw an impermissible inference of guilt from a refusal. No such inference was required because the evidence was sufficient to invoke the sanctions of the policy without the test results or any refusal to take the test.

Finally, the court believes that the breathalyzer is not an exceptionally invasive procedure. Taking a student to the police station to blow into a breathalyzer machine is little more invasive in itself than taking a child to a five-and-dime store to blow up a balloon.

▮ The court wishes to point out, because of apparent uncertainty during trial, that a refusal to consent to a search cannot lead to an inference of guilt unless the search is initially authorized by the Fourth Amendment. Obviously where a search is not justified, refusal to allow it supports no inference at all, just as a refusal to give a statement in a criminal case cannot be considered as evidence of guilt of an accused.

The court became convinced during the trial that Anable is a bright young man who "knew what he was doing" during the trial, and is equally convinced that he was fully aware of his options before taking the test and knowingly agreed to take it because he thought that he could "pass" it. It simply turned out that he wasn't quite as knowledgeable, at least in that field, as he thought he was. Having carefully considered all of the circumstances surrounding Anable's consent, the court concludes that the consent to the breathalyzer was voluntary and not coerced. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ Therefore, the court concludes that Anable's taking of the breathalyzer test implicates no constitutional infirmity because Anable's consent was freely and voluntarily given. Additionally, it appears that the school officials were entitled to believe that there was a "clear indication" that alcohol in a significant amount would be found in Anable's breath and blood.

Although the policy does, on its face, state that a breathalyzer test can be *required*, and notwithstanding that Dr. Ford seemed to believe that a refusal to comply can be considered as evidence of guilt, the officials unanimously testified that a breathalyzer test cannot be requested under the policy as implemented unless a student has already demonstrated, by overt action and behavior, sufficient evidence of alcohol consumption to justify expulsion or withdrawal. Because Anable is the only student to have undergone such testing, the court has no reason to believe the policy is not administered as the officials testified. So administered, the policy comports with constitutional requirements.

■ The court also concludes that Anable was provided sufficient due process in connection with his withdrawal for the additional semester. It must be remembered that a student's election of withdrawal eliminates the possibility of the underlying facts being made public or becoming a part of the student's permanent record. Thus, there are legitimate reasons why a student might elect this course rather than gamble on the outcome of a public hearing. The student is in the best position to judge whether he or she has or has not violated school rules or the law. Absent cogent evidence of coercion or duress, courts cannot assume that such a decision is involuntary.

Anable was provided copies of the drug/alcohol policy, tobacco policy, and expulsion policy. The expulsion policy provides that a reasonable time and date for a hearing shall be set upon request. Notice of the time, date and place of the hearing is provided to the student and parents. The charges are to be stated in clear, concise terms. An attorney may be present. A student is given an opportunity to present his version of the facts, observe all evidence against him, and to cross-examine witnesses. A student may remain in school pending the hearing decision unless the student's conduct justifies immediate dismissal.

Plaintiff Anable was fully aware of these rights, as was his mother, at the time that the withdrawal form was executed. The form states clearly that Anable was to be withdrawn until "August 1984." The reasons listed are clear: "Alcohol—odor of alcohol and point .06 Dec. 8, 1983. Misconduct during and after the incident at school."

Although Anable's mother testified that she did not read the form, a glance at the form would have provided this information in clear and unambiguous terms. Further, there is some indication in the testimony that Anable and his mother had discussed the extra semester's withdrawal prior to the execution of the form. From the evidence, it does not appear that any attempt was made to mislead plaintiff or his mother with regard to the second semester's withdrawal.

The withdrawal form (see Defendants' Ex. 7) clearly states: "I acknowledge the right to hear all witnesses against me and to present my case in a hearing before the School Board, but hereby waive these

rights." Had Anable opted for such a hearing, this court could have reviewed that decision and set it aside if wholly unsupported by the evidence. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, plaintiff and his mother elected to waive such a hearing, either to prevent the matter from being made public, to prevent the incident from becoming part of plaintiff's permanent record, or for any other reason of which the court is unaware. This court cannot *presume* that the hearing would have been a futile, meaningless "rubber stamp." Without clear evidence that such is the case, a case-by-case review is the more prudent and correct course for the court to adopt.

The court is unable to conclude that the circumstances surrounding plaintiff's withdrawal from school until August, 1984, implicate any constitutional infirmity or demonstrate any other reason to set aside the withdrawal.

Plaintiff Anable has failed to present facts justifying the relief sought and, accordingly, his claim is dismissed.

### (c) The Claim of Laura Balch

Plaintiff Balch contends that the urinalysis test which she underwent is unreasonable in the school setting under any circumstances, but that, if it may be required under certain circumstances, probable cause must be present plus a clear indication that further evidence will be found. Balch also urges that her consent was ineffective and that the school lacked the requisite "individualized suspicion" to administer the test. She further asserts that she was denied procedural due process and substantive due process. Finally, she argues that the policy fails to provide adequate notice of what conduct is prohibited.

■ Initially the court notes that, although some of the terminology employed is somewhat vague, Balch cannot be heard to complain that she was unaware that the use or possession of marijuana was not clearly proscribed in the policy. Because Balch falls squarely in the "hard core" of the policy by being accused of actions the policy clearly and legitimately proscribes, she will not be permitted to argue that the policy could be unconstitutionally applied to others not before the court. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1972); *United States v. Lemons,* 697 F.2d 832 (8th Cir.1983).

In *T.L.O., supra,* the Supreme Court rejected the notion that school officials act *in loco parentis* in their dealings with students. *T.L.O.,* 105 S.Ct. at 740. In conducting searches of schoolchildren, school officials act as representatives of the state. Even in schools, schoolchildren receive Fourth Amendment protection from the actions of school officials when they possess an expectation of privacy that society is prepared to "recognize as legitimate." *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

Competing with a student's expectation of privacy are the interests of teachers and administrators in maintaining discipline in the classroom and on school grounds. *T.L.O.* at 742. The preservation of order and a proper educational environment requires close supervision of schoolchildren. Nonetheless, teachers and school officials are not law enforcement personnel and their task is to educate, not to ferret out crime or other nefarious activity.

It is clear that the urinalysis test undergone by plaintiff Balch, Faye Gleason and Stephanie Malone was utilized by school officials to determine whether any of the three had *used* marijuana at school. Such a test can ascertain nothing regarding a student's *possession* of marijuana. It is obvious from the evidence that none of the three students tested in connection with the incident were accused of being under the influence of marijuana at school.

The evidence against plaintiff Balch was simply that she, along with Faye Gleason and Stephanie Malone, had been in the girls' restroom at a time when, apparently, marijuana was smoked there. Stephanie had told school officials that either Faye Gleason or plaintiff Balch had a "joint" in her hand at the time. Both Gleason and

Balch denied this. In contrast to the situation presented in Anable's case, Balch was not informed of all of the evidence against her in that school officials did not advise her that Stephanie Malone had reported that either plaintiff Balch or Faye Gleason had had a "joint" in her hand. Additionally, school officials admitted that they would not have expelled Balch or imposed sanctions under the policy based upon the information at their disposal at that time. Further, Balch, Gleason and Malone all testified that they were told they "had" to take the test.

The court believes that the three girls were led to believe that they "had" to submit to the test on pain of dismissal from school. In contrast to Anable's situation, the girls were not merely given the "option" of submitting in an effort to exonerate themselves. None of the girls had to "exonerate" themselves because, according to school officials, no sanctions would have been imposed based on the information at hand which they were prepared to offer. The court does not believe that any of the girls would voluntarily have submitted had they been told this.

■ Based on these facts, the court concludes that Balch's consent was ineffective because she was not fully informed and was in fact misled. To believe the consent was freely and voluntarily given requires one to believe that Balch knowingly submitted to a test which could "prove" her guilt in the minds of school officials, although the test was purportedly "optional," when there was insufficient evidence in the absence of the test to warrant the imposition of sanctions based on the evidence which officials were prepared to present. Few students would be foolish enough to comply under these circumstances.

The results of the urine test utilized provide very little more information regarding the event at school. As defendants point out, the Emit immunoassay test is more likely to produce a false negative result than a false positive result. However, any chemical substance similar in chemical makeup to a cannabanoid, such as steroids, can produce a false positive.

The nature of the test renders the propensity to yield a false negative result as important as a test with a high propensity for yielding a false positive result. The immunoassay test can detect marijuana constituents in the urine for weeks after use. Thus, the test of a heavy or chronic marijuana user may have a positive test result while a "newcomer" to the drug, or occasional indulger, may register a negative test result although the occasional user had smoked marijuana in the preceding few hours. The test results alone would cast a heavy suspicion of guilt on the heavy home user while "exonerating" the guilty infrequent user. In fact, Gleason testified that she smoked marijuana the night of the school incident, yet she tested "negative."

As Dr. Harbison testified, the urine test used cannot detect the pharmacologically active ingredient—delta–9–tetrahydrocannabinol, and thus provides no information at all as to the effects on the user. Nor can the immunoassay test establish the date or time of use or the amount consumed. Therefore, the use of the immunoassay test provides no information as to whether any given student has used marijuana while at school, possessed marijuana at school, or was under the influence of marijuana while at school.

All that a positive result can indicate is that the subject has ingested a marijuana-like substance within the preceding weeks or days. Therefore, the use of the test results to confirm or deny the version of events that plaintiff Balch conveyed to school officials was irrational, arbitrary and capricious.

Because of the propensity of the test to yield a false negative result, its use to "exonerate" a student is equally without basis in fact. Therefore, the test results alone do not indicate that Faye Gleason or Stephanie Malone had not used marijuana on the day in question.

Regardless of the relative "intrusiveness" of the urine tests, the test used bears so little relation to the guilt or innocence of any particular student that its use as a determining factor (see testimony of Dr. Ford, Principal Green) cannot be consistent with constitutional requirements.

At this point it is urged that the school officials may impose sanctions upon students based upon the results of the immunoassay test, regardless of whether it can indicate use of marijuana while at school or whether a student is under the influence of marijuana at school. The court disagrees. Schools may not expel students merely because they may have ingested an unknown quantity of a marijuana-like substance of unknown quality, producing an unknown pharmacological effect, at some unascertained point in time within the preceding weeks. The immunoassay test measures only the presence of urinary metabolites of "marijuana-like" constituents relying on the presence of antibody proteins which are developed by the body and adhere to the constituents.

 The court is unaware of any authority which indicates that the involuntary retention of such metabolites in the urine for weeks after use constitutes a crime in the state of Arkansas. Although the knowing possession and control of small amounts of marijuana is a Class A Misdemeanor, Ark.Stat.Ann. §§ 82–2614.2, 82–2617(c) (rather than a Class A Felony as defendants suggest on p. 26 of their post-trial brief), the court has no reason to believe that trace-metabolites of marijuana-like constituents in the urine, causing no pharmacological effects, of which the student has no control or knowledge, would be treated any differently in the law than trace amounts of alcohol in the body of a minor, which is not unlawful. *See* §§ 48–903.1, *supra.* Even if the presence of marijuana constituents in the urine were unlawful, the Emit immunoassay test cannot distinguish the presence of the same from the presence of steroids or any other structurally similar chemical. To impose a sanction as severe as expulsion for the mere

presence of these urinary metabolites in the body would, in a criminal case, constitute an impermissible punishment based on "status," *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; *see also T.L.O., supra,* at 740 n. 4, and in the present context constitutes an improper attempt by school officials to regulate off-campus conduct unrelated to school order or discipline. *T.L.O.* made clear that the permissible regulatory scope of school officials extends only to "maintaining discipline in the classroom and on school grounds" and during school functions. *T.L.O.* at 742. Rules reasonably related to the maintenance of security and order in the classroom and the preservation of a proper educational environment are certainly within the proper sphere of authority of school officials. However, for the reasons discussed above, and because of the described deficiencies of the test, the court concludes that use of the test is not reasonably related to the maintenance of order and security in the schools nor to the preservation of the educational environment and processes. To the extent that the test and policy attempts to regulate out of school conduct in no way affecting the school setting or the learning process, the test and policy are improper.

This is not to imply that such an objective is not laudable. Certainly it would be beneficial to the vast majority of students who do not use drugs or alcohol, even at home or on the streets, to segregate users from the halls of education. This is not to say, or even imply, that such use is accepted or condoned in any manner by the court. On the contrary, the court condemns such conduct in the harshest possible terms. Nonetheless, such conduct is within the realm of parents and law enforcement officials, not teachers and educational administrators.

Suffice it to say that the use of the Emit immunoassay test, however noble its purpose, reaches beyond the permissible boundaries of authority of school officials.

 The extremely limited utility of the urine test used in this case is but one

reason such a test is not properly used in the school setting. The court concludes that requiring a teenaged student to disrobe from the waist down while an adult school official, even though of the same sex, watches the student urinate in the "open" into a tube is an excessive intrusion upon the student's legitimate expectations of privacy under the circumstances present. The excessively intrusive nature of the search is not justified by its "need." Such a search is not "reasonable" under the circumstances, within the meaning of *T.L.O.*

Before such a search could *ever* be justified, there must be a "high probability" that the search would disclose evidence of a violation of school rules or the criminal laws. *Schmerber, supra.*

If, as Superintendent Ford and Principal Green indicated, such a search would not, in fact, be conducted absent overt manifestations of recent use by a student sufficient to justify dismissal, then such a test is unnecessary. If there is not a "high probability" or "clear indication" that such a test would yield evidence of illicit activity during school, then the search is not "justified at its inception." *T.L.O.* at 742.

■■■ *T.L.O.* is not to the contrary. "Under *ordinary* circumstances, a search of a student by a teacher or other school official will be justified at its inception where there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.* at 742–44. Absent such overt manifestations of recent use, there is insufficient reason to believe that there is a "high probability" that probative evidence will be disclosed by the intrusive search. Put another way, if there is a "clear indication" that such evidence will be found, the urine test is far too invasive in the school setting to justify its need, because the overt manifestations of recent use, plus a "clear indication" that incriminating evidence will be found in the urine, will be sufficient to justify the imposition of policy sanctions without the test.

This is not a criminal case where evidence beyond a reasonable doubt would be needed to demonstrate to a jury a defendant's "condition" at the time of arrest. The school officials can observe the student first-hand, listen to any proffered explanation, confront the student with the evidence at hand, and formulate a decision as to whether a student has used marijuana during school hours or is under the influence of marijuana at school. If school officials cannot decide with sufficient certainty, then they will have failed to demonstrate a "clear indication" that incriminating evidence will be found in the urine or body fluids. If there is a "clear indication," then the test is not sufficiently "necessary" to justify its excessively intrusive use.

The court notes that the evidence available to school officials at the time of the questioning of the three girls indicated not only that plaintiff Balch, Faye Gleason, and possibly Stephanie Malone, conceivably had *used* marijuana at the school, but that at least one of the three had perhaps *possessed* marijuana at school. Nonetheless, no search of the persons, purses, belongings, desks, or lockers was instituted. This type of search, in appropriate circumstances, is much less invasive than the urine tests used, and the results of such a search are far more probative. Why such a search was not considered was not explained. Perhaps school officials felt there was insufficient evidence to justify such a search. If so, there was clearly insufficient evidence to justify the urine tests.

Nonetheless, this ruling of the court does not mandate a finding that plaintiff Balch was improperly removed from school. It is clear that the only reason school officials felt that there was insufficient evidence to justify a recommendation of expulsion of Balch prior to the test is that Stephanie Malone had indicated that she would not *publicly* accuse Balch or Gleason.

■■■ The school's expulsion policy grants aggrieved students the right to confront and cross-examine their accusers. Due process considerations would require

this as well. The school officials chose to protect the confidence of Stephanie's accusation rather than to expel Balch based on the evidence at their disposal.

Balch and Gleason were in the restroom together at a time during which very few students had access. It is undisputed that marijuana had been smoked in the restroom at or near the time that Balch and Gleason admitted their presence there. Stephanie Malone had reported that either Balch or Gleason had a marijuana cigarette in her hand. She had further reported that Balch had asked her not to "turn them in" to school officials. Notwithstanding that Balch was aware that marijuana would remain in the urine for at least days, she purposely smoked marijuana over the weekend, knowing that this might tend to "show up" in the later testing. She admitted that she drank vinegar after her father told her that drinking vinegar would render the test unreliable. Although plaintiff Balch testified that she drank vinegar because she "likes" it, the court views this testimony as an example of the inherent untrustworthiness of Balch's testimony and an almost complete lack of credibility.

If this court could decide the merits of plaintiff Balch's claim based upon whom the court believes, Balch would lose summarily with little discussion. Based upon her conduct and demeanor, her testimony concerning her repeated and extended use of marijuana, as well as the actions to which she testified she undertook in response to the charges, and the unbelievability of her testimony, including her recital of a "fondness" for vinegar (which almost insults the intelligence of the court), the court has no hesitancy in concluding that she, either alone or in concert with Faye Gleason, possessed marijuana at school in violation of the policy.

The court concludes that school officials were justified in concluding that there were reasonable grounds to believe that plaintiff Balch had at least possessed marijuana at school. There was sufficient "individualized suspicion," *see T.L.O.* at 744 n. 8, of Balch's guilt to warrant school

officials in believing she had in fact violated the policy and to call upon her to make an explanation. School officials had an opportunity to observe her conduct and demeanor and formulate a belief as to the credibility of her explanation.

The court's own views as to the existence or absence of "reasonable suspicion" in any given case are immaterial. In *T.L.O.*, the Supreme Court found the New Jersey Supreme Court's conclusions regarding "reasonable suspicion" in that case to be "implausible," *see T.L.O.* at 744, and based upon "a somewhat crabbed notion of reasonableness." *T.L.O.* at 744.

In *T.L.O.* the Court found that a teacher's report of T.L.O.'s smoking in the lavatory gave rise to a "reasonable suspicion" that T.L.O. possessed cigarettes in her purse. This justified a search of T.L.O.'s purse for cigarettes.

In this case we have far stronger evidence. Balch or Gleason, acting in apparent concert, had been observed in the possession of marijuana. The possession of marijuana was observed in a location to which very few students had access. That location was shortly thereafter conclusively found to contain thick marijuana smoke. Either Balch or Gleason flushed a toilet upon observation by Stephanie Malone. Gleason had asked Stephanie Malone not to "tell on her." School officials protected Stephanie because of Stephanie's "fear" of plaintiff Balch.

Thus, school officials had a cohesive picture of events: a first-hand observation of illicit possession of marijuana by a student, circumstantial evidence that marijuana was smoked at the exact time and in the location that Balch and Gleason were observed with marijuana, access to this area at this time was extremely limited, Balch's utterance of an incriminating admission against interest, the witness' legitimately expressed fear of reprisal, and Balch's explanation which school officials believed was devoid of credibility.

Thus, the court believes that school officials were justified in concluding that plain-

tiff Balch had violated the policy, and could legitimately have recommended expulsion. That they would not have done so, in order to protect Stephanie, says nothing about the legitimate inferences school officials were entitled to draw at that time, and which they had in fact drawn.

This does not mean, however, that plaintiff Balch is entitled to no relief. Because the use of the urine test was not "voluntary," plaintiff Balch is entitled to damages caused by the excessively intrusive scope of the violative search, which by its nature cannot shed significant light on the guilt or innocence of accused students. She is further entitled to relief occasioned by the school's violation of her rights to procedural due process, brought about by the failure to inform her of all of the evidence against her prior to utilization of the test and the school's request for Balch to voluntarily withdraw.

The violation of procedural due process involves only nominal damages, however. The court finds that had Balch been informed of all of the evidence against her, she would nonetheless have withdrawn from school, school officials would have been justified in recommending expulsion, and the school board would have been justified in removing her from school. The court is convinced that a full board hearing would have accomplished nothing favorable to Balch, and from Balch's viewpoint, would have been futile.

Although school officials should not have considered the results of the urine test in formulating its position as to Balch's withdrawal, the test results were mere surplusage and unnecessary to the ultimate determination. In essence, the school officials were justified, but for the "wrong" reason.

The court is aware that it has repeatedly stated that the school officials would not, in fact, have removed plaintiff Balch from school in the absence of the test results. However, the court has attempted to make clear that this was a conscious decision on the part of school officials to protect Stephanie Malone, and does not reflect an acknowledgment of the limitation of their authority or inability to do so. The court cannot assume that Stephanie Malone would have recanted her story at a board hearing. She did, in fact, testify freely and in detail at the trial of this cause.

Therefore, any damages occasioned by any deprivation of procedural due process are nominal only, and plaintiff Balch is therefore awarded One Dollar ($1.00). *Pollock v. Baxter Manor Nursing Home*, 716 F.2d 545 (8th Cir.1983).

The court concludes that plaintiff Balch is further entitled to the sum of Five Hundred Dollars ($500.00) as compensatory damages arising from the excessively intrusive Fourth Amendment violation in the form of a "coerced" or "required" urinalysis. The court simply believes, after hearing her testimony and having had the opportunity to observe her demeanor while on the stand, that she is not entitled to more. She did not show that she was particularly embarrassed or that she suffered any other detrimental effects as a result of the test.

## VI. Conclusion

The court concludes that plaintiff Matthew Pless lacks the requisite standing to pursue this action.

The court additionally finds and concludes that plaintiff Anable and his mother freely and voluntarily consented to the breathalyzer test. The court further finds and concludes that school officials were warranted in concluding that there was a "high probability" and "clear indication" that significant levels of alcohol would be found in the plaintiff's breath. The court finds and concludes that plaintiff Anable appeared at school under the influence of alcohol sufficient to significantly impair his ability to function on a physical or mental task, and that plaintiff's removal from school was justified to prevent further disruption of the educational environment and school order. Finally, the court finds and concludes that plaintiff Anable and his mother voluntarily and with full knowledge withdrew him from school for two semesters, expressly waiving all rights to hearing by the school board.

With regard to plaintiff Balch, the court finds and concludes that she did not voluntarily consent to the urinalysis and that school officials were not warranted in concluding that there was a "high probability" and "clear indication" that significant evidence would be disclosed by the Emit immunoassay urine test. The court further finds and concludes that the use of the Emit immunoassay test is an effort by school officials to impermissibly regulate and control activities of students unrelated to the school environment or legitimate goals of school officials, and is not sufficiently probative of the guilt or innocence of the student to justify its use. Additionally, the court finds and concludes that the use of urine tests, as applied in the Arkadelphia school system, is unnecessary, and is excessively intrusive in light of the age and sex of the students and the lack of need therefor. Further use of such tests, as presently applied, is hereby enjoined. Finally, the court finds and concludes that plaintiff Balch was not accorded procedural due process in connection with her withdrawal from school, but that, even had plaintiff Balch been granted a full trial prior to her withdrawal, the same result would have obtained, and that school officials were completely warranted in concluding that plaintiff Balch possessed marijuana on school property and during the school processes. Plaintiff Balch is therefore awarded One Dollar ($1.00) as nominal damages, and Five Hundred Dollars ($500.00) as compensatory damages arising from the excessive nature of the search.

A separate judgment in accordance herewith will be concurrently entered.