Darcy L. SCHAILL, by next friend, William and Mary KROSS; and Shelley M. Johnson, by next friend, Donald C. Johnson, Plaintiffs,

v.

TIPPECANOE COUNTY SCHOOL CORPORATION, Kenneth J. Koger, Superintendent of Tippecanoe County School Corporation, Gerald P. Risk as President of School Board Trustees, Paul A. Slavens, Joseph Albregts, Richard Harlow, Sr., James Mosley, Robert Berninger, Leslie Bryan, as Board of School Trustees of Tippecanoe School Corporation, Defendants.

Civ. No. L 87-90.

United States District Court,
N.D. Indiana,
Hammond Division.

Feb. 1, 1988.

Louis Pearlman, Jr., Edward J. Nemeth, Lafayette, Ind., Richard A. Waples, Judith A. Stewart, Indianapolis, Ind., for plaintiffs.

James V. McGlone, Laura L. Bowke, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On August 25, 1987, the plaintiffs filed a Complaint for Declaratory and Injunctive Relief, alleging a cause of action under Title 42 U.S.C. § 1983, with jurisdiction founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

On September 3, 1987, the court heard arguments of counsel and testimony of witnesses, received exhibits and directed that the parties file supplemental briefs. The defendants submitted a revised version of the drug testing program for high school athletes which is the subject of this suit. At the close of the hearing, the plaintiffs indicated a need to present additional evidence. Considering the ensuing statements of the parties by counsel and the nature of this case, the court set additional hearing dates and, pursuant to Rule 65(a)(2), ordered consolidation of the hearing on preliminary injunction with a full trial on the merits.

On December 7, and 8, 1987, the parties presented additional evidence. All issues have been fully briefed. Having held a complete trial on the merits, the findings of fact and conclusions of law in this opinion are intended to fulfill the requirements of Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

### FACTS

The plaintiffs, Darcy Schaill and Shelley Johnson are sophomores, as of the fall of 1987, at Harrison High School, one of two high school attendance centers of Tippecanoe County School Corporation (TSC). Each of the young women has stated a desire to participate in interscholastic sports, but both object to the school's intention to implement a random urinalysis drug testing program for athletes. There is no suggestion in this case that either plaintiff has ever used illicit drugs. Miss Johnson does take prescription medications for asthma and allergies.

TSC, the defendant school corporation, operates under the laws of Indiana, both Harrison and McCutcheon High Schools. McCutcheon serves about eleven hundred students, out of which about three hundred fifty are said to participate in interscholastic sports. The student population at Harrison is about twelve hundred fifty, including about four hundred student athletes.

Defendant Kenneth J. Koger is the Superintendent of TSC, and the additional named defendants make up the Board of Trustees, with Defendant Gerald P. Risk acting as president at all times relevant to this case. The defendants do not deny having acted under color of law in relation-

ship to this action, and are sued in their official capacities.

In the spring of 1986, sixteen members of the McCutcheon baseball team provided urine samples to be analyzed for the presence of drugs. One student's analysis resulted in a definite positive reading. As a consequence, the student was suspended for one-half of the baseball season, but returned to finish the season, having tested negative on subsequent analyses. Four other athletes' tests showed traces of marijuana. These student athletes admitted to having smoked the drug within the preceding month. The following fall, having been warned there would be random tests resulting in possible suspensions, sixty-six McCutcheon athletes from all interscholastic fall teams were tested. All showed negative results, with none refusing to provide samples.

At this point the idea of developing a testing program at Harrison began to take shape. Although initially there was discussion about implementing a program throughout the corporation, upon referral to a committee and months of consideration, the board approved a policy of testing exclusively for athletes on August 12, 1987. A draft of the program was attached to the plaintiff's complaint, but, as previously mentioned, the defendants presented a current, more narrowly drawn version in open court on September 3, 1987. This version essentially reduced the discretion of coaches in the selection process, and spelled out more fully the procedures and ramifications of testing.

The program was scheduled to begin October 1, 1987, but early attempts toward implementation resulted in this suit. Consequently, implementation was halted pending a court decision. Assuming an outcome in its favor, TSC intends during the 1987–88 academic year, to require that students involved in interscholastic sports submit the following form:

I have received and have read and understand a copy of the "TSC DRUG EDUCATION AND TESTING PROGRAM." I desire that _____ _____ participate in this program and in the inter-

scholastic athletic program of _____ School and hereby voluntarily agree to be subject to its terms. I accept the method of obtaining urine samples, testing and analyses of such specimens, and all other aspects of the program. I agree to cooperate in furnishing urine specimens that may be required from time to time.

I further agree and consent to the disclosure of the sampling, testing and results as provided for in this program. This consent is given pursuant to all State and Federal Privacy Statutes and is a waiver of rights to non-disclosure of such test records and results only to the extent of the disclosures authorized in the program.

The student and his or her custodial parent or guardian must sign and date the form, submitting it as a condition precedent to practice or participation in any given athletic season. The program requires that all student athletes attend one educational session or more and receive copies and an explanation of the program.

By way of overview, TSC's program and policy statement begins with a reflection on the seriousness of drug and alcohol problems in the schools, stating as a general principle, and as a matter within the experience of the drafters, that "some student athletes have used alcohol and have experimented with 'street drugs' such as Marijuana and Cocaine, or may do so during their middle or high school years." The policy statement expresses that the drafters "have information indicating drug usage by members of interscholastic teams of TSC." It is further observed that "[t]he NCAA encourages its members to undertake their own programs to test for the possible use of 'street drugs' and 'performance enhancing drugs.' "

The revised version of the TSC program clarifies that its purposes are educational, diagnostic and preventative, as opposed to punitive or disciplinary. The program is intended to involve all participants in interscholastic sports teams, both male and female, as well as members of cheerleading

teams, all of whom are collectively denominated "student athletes."

As part of the rationale, the program adds that student athletes are especially respected by the student body, and accordingly are expected to be "good examples of conduct, sportsmanship and training, which includes avoiding drug and alcohol usage." Moreover, the program proposes that a participant who uses drugs can be a danger to self or others. The purposes of the program are stated as follows:

... to prevent drug and alcohol usage, to educate student athletes as to the serious physical, mental and emotional harm caused by drug and alcohol abuse, to alert student athletes with possible drug problems to the potential harms, to prevent injury, illness and harm as a result of drug and alcohol abuse, and to maintain at TSC high schools an athletic environment free of alcohol and drug abuse.

The athletic director, or the head coach of each team within that coach's season, are authorized to initiate a selection of student athletes for testing. The program sets no limit as to the number of individuals to be selected nor the number of times that selections will be made. Each student athlete is assigned a number, with one cross-reference list, which is kept by the athletic director. When a selection is made, the numbers of all team members are to be placed in a box and drawn randomly. Once selected, the student athlete must "provide a sample of his or her urine in a verifiable manner, but the collection of the sample shall not be physically observed." The sample bottle is to be labelled with the date and the student athlete's number, whereupon he or she and the athletic director will initial the cross-reference list to verify its accuracy. At this point the sample will be given to a "competent laboratory" which may test for "alcohol, 'street drugs' ... and 'performance enhancing drugs' (such as steroids)." Only the head coach, the athletic director and the staff member obtaining the sample, will know of a selection. Only the student athlete, his or her custodial parent or parents or guardian, the athletic director, and the head coach will be informed of the results.

The student athlete is advised to inform the athletic director if he or she takes medication that might contribute to a positive test result. A test result is considered positive only if, after using at least two types of analyses, it indicates that drug-residue substances are present in the system. Upon such a finding, the student athlete, parent or guardian will be given an opportunity to provide additional testing or other means of explaining the positive result. If no satisfactory explanation is made, counseling or other assistance might be suggested.

The program provides that a student athlete who tests positive and provides no satisfactory explanation will be retested after an interval of time which is sufficient to indicate if intervening drug use has occurred. Any follow-up tests will be conducted procedurally the same way as were the initial tests. A student athlete found positive without providing proper explanation will be subject to testing at any time during any sports season in which he or she chooses to participate. TSC also reserves the right to test any student athlete at any time where reasonable suspicion of drug or alcohol usage is found to exist.

The program specifically provides that no student athlete who tests positive will be disciplined in any way academically. No suspensions or expulsions from school will result from the testing program. In the context of acknowledging the special broad authority of coaches to impose prohibitions against alcohol, drugs, and tobacco, the plan sets forth the consequences of a positive test which has not been properly explained.

With an emphasis on athletics as a privilege and not a right, the plan specifies that the first occurrence involving alcohol will result in denial of 20% of the athletic contests of a particular sport, which may in some defined circumstances carry over to the immediately subsequent sport. Positive testing for drugs other than alcohol will result in a 30% suspension of the contests of a sport. The second indication of either alcohol or drug usage will result in a

50% suspension from the current sport, with potential carry-over to the next sport. The third occurrence will result in a full calendar year of athletic suspension. The fourth occurrence will result in suspension from interscholastic athletics for the entire school career. On the first or second occurrence, the period of suspensions may be reduced by 1% per hour of counseling, which must be verified and approved by the athletic director. Denial of participation is meant to apply to varsity contests, and the effect on practice is left to the discretion of the coach.

## II.

### TESTIMONY

At the September 3rd hearing, defendants presented Dr. Lyle Combs, team physician for Purdue University athletes, who reviewed the effects of various drugs on sports participants. In his opinion the risk of injury to athletes is greater for drug users because of impaired psychomotor skills or perception. He estimated that drug usage is undetectable by observation more than 95% of the time. Dr. Combs acknowledged that urinalysis testing does not identify if a person is under the influence of a drug while playing, but rather if certain drugs were in the body at the time of testing. This testimony was confirmed by several other witnesses. In his opinion, however, if drugs are in the body for four days and practices are scheduled five or six days of the week, it is reasonable to conclude that the athlete was at risk. Dr. Combs indicated that from NCAA surveys, about twenty to twenty-five percent of athletes use drugs or alcohol in varying degrees.

Testifying twice, Miss Darcy Schaill stated that she began participation in cross-country just before the 1987–88 school year. Although she does not use drugs, she feels uncomfortable with the program. Miss Schaill testified that she knew of no one, either on the cross-country team, or at Harrison High School that uses drugs. The witness expressed concern about the confidentiality aspects of the program, and discussed a slide presentation that she saw at school on the subject of drugs. Miss Schaill recognized that there might be reasons other than drugs that a student might discontinue participation in sports. She was unaware of what the educational aspects of the program might be once implemented.

Mr. William Cross, step-father of Darcy Schaill, testified that he viewed the program as an affront to Miss Schaill's dignity, an invasion of her privacy, and beyond the business of school officials. He acknowledged instigating this action, having contacted parents, the school board, and finally the Indiana Civil Liberties Union, in his efforts to prevent implementation. Although he viewed sports as beneficial, he did not intend to sign the consent form. Shelley Johnson's father basically joined in this position, underlining the longevity of his daughter's involvement in swimming.

Shelley Johnson, also testifying on two occasions, objected to the singling out of athletes for testing. Although the witness had seen intoxicated students at dances, she initially could think of no one in the school who took drugs. Miss Johnson testified that her asthma and allergies are helped by swimming. She expressed a belief that her medication might cause a positive showing, but acknowledged that this fear was not formed in relationship to any particular type of test. At the first hearing Miss Johnson stated that although a private swim club was available, it would not fit into her schedule. At the second hearing the witness had dropped swimming due to a conflict with her allergy shots, but intended to go out for swimming the next year. Miss Johnson then recalled that she knew of about five, six or seven students at school who used drugs, but that they were non-athletes. She theorized that athletes, as overachievers, were less likely to use drugs than non-athletes.

Dr. Daniel Conn, a toxicologist who was enlisted for both the earlier testing and the TSC program, testified that he will, assuming implementation, pick up sealed specimens which have been kept in a locked refrigerator, and deliver them to the laboratory. There, the specimens will be tested

using immunoassey technique (EMIT) for the screening of marijuana, followed by thin layer chromatography (TLC). If both the EMIT and TLC are positive, gas chromatography mass spectography (GCMS) will be used for further confirmation. For drugs such as amphetamines and opiates, the preliminary procedure will be TLC followed by GCMS for confirmation. Three tests will be used to confirm the presence of cocaine. No tests will be conducted to test for pregnancy or birth control pills. Mr. Conn stated that while some of the medications used by Miss Johnson will not even show up, others will not in any way interfere. The witness added that portions of all positive samples will be retained for up to one month, locked in a refrigerator or freezer. Although Mr. Conn could not say how the specimens would be collected, he opined that checking the temperature at collection would be a means of assuring validity. The laboratory will charge $12.00 per test including confirmation. All tests will be reported as positive or negative, although results of a specific test would be available.

Mr. Conn stated that the laboratory is accredited by the Joint Commission of Hospitals, and has been approved for OSHA lead testing. He indicated that, as a member of the American Association of Bioanalyst Proficiency Testing Program and the College of American Pathology Testing Program, the laboratory receives four sets of samples a year containing unknown drugs. The analyses are then graded for purposes of approval. These tests are not "blind tests" in the sense that the laboratory is aware that it is being checked for proficiency. The witness acknowledged that urinalysis testing does not measure current impairment, that passive inhalation of marijuana smoke might conceivably result in a positive reading, and that the accuracy of the tests is dependent upon such factors as the technologist, the instruments, and the maintenance and quality control. Mr. Conn stated that the laboratory would be using a 20–nanogram detection level for marijuana, which would be expected to result in 95% confidence. He acknowledged that at this level it was pos-sible that small residues of marijuana might not be picked up by the test. He further indicated that he would not be testing for alcohol, unless the school so requested.

Mr. Jacob Burton, assistant principal, athletic director, and baseball coach at McCutcheon High School, testified that physicals are required for athletes and that TSC has training rules for the entire sports program. Certain activities are specifically prohibited and participation requires the maintenance of grade standards set by the Indiana High School Athletic Association (IHSAA).

The witness acknowledged that he initiated the earlier pilot program which resulted in actual testing in May of 1986 and described that program in detail. At this point in the proceedings, the witness mentioned the first name of the young man who tested positive, at which time the court interrupted with a caution about confidentiality.

Mr. Burton recalled that in the earlier testing, student athletes were formed into groups of 20. Each week for six weeks, 11 athletes were selected, one from each group, by drawing the name in view of group members each Monday. On Tuesday, samples were submitted by males to Mr. Burton, and by females to the girls' physical education teacher. Bottles with a cap and seal were provided by the toxicologist. Once sealed, they were stored in a refrigerator until Mr. Conn picked them up the next morning. Results were reported that afternoon. All 66 student athletes tested negative.

Mr. Burton stated that although he may have noted a lessening of performance in the earlier five athletes, he could not have attributed this condition to drugs without the tests. He viewed the local problem as no better or worse than the nation-wide problem. His assessment was based on readings, the test results, and information from returning alumni who confirmed that a particular injury had resulted from, or been worsened by, drug usage.

The witness described a football player, who admitted to having been under the influence of "speed." In this condition he had assumed his finger to be "jammed" and asked another player to pull it. Later he learned it was broken. Mr. Burton further recounted a baseball player who, responding to an "86 or 87 mile-an-hour fast ball," "took one on the nose" instead of turning away. The player later confessed to being "on marijuana". Additional examples included a football player thought to have endangered himself by masking pain with drugs, and an experienced outfielder who missed easy catches and later admitted to having used marijuana. The witness then focused on his concern that athletes be able to identify pain for a trainer, so as not to be wrongly sent back into play. He worried that drugs might trigger cardiac arrest or respiratory problems, and stated an opinion that gym classes do not operate with similar intensity. He believed that participants in intramural sports tended to be more self-regulating due to a tendency to be out of shape.

Mr. Burton believed that, in general, and in the eyes of his own children, student athletes stand out from other student performers, due to their notoriety. He viewed athletes as role models, who could reasonably hope that the qualities learned in sports, such as pride, self-confidence, and individuality would carry over into adult life.

Over objection, the witness described community response to the earlier program as positive. In speaking of the goals of the intended program, Mr. Burton referred first to keeping athletes drug free, and he responded affirmatively to questions related to health, safety and education goals. The witness pointed to the provision for reduction of penalty by counseling as a sign of the motivational purpose of the program. He stated that suspension also served the program by allowing time for an athlete's system to clean itself up, and by deterring future use.

On cross-examination Mr. Burton admitted he had never observed a student athlete taking drugs, but felt he could recognize the effects of drugs retroactively, from the McCutcheon testing. He admitted that team physicals differ from the testing program in allowing the student to choose between a family doctor and the less expensive service arranged by the school. The physicals do include urinalysis, but they test only for sugar. The witness stated that he initiated the testing program because admissions of alumni coupled with observed changes in performances made him think alumni stories of a drug problem were true. He acknowledged that he did not know what he would have done if any of his sixteen baseball players had refused to consent to the testing, since that problem did not arise.

Mr. Burton testified that if the program went into effect and his star player refused to sign, the player would be denied participation. He expressed that although the pilot program was not very confidential, the only record of it has remained sealed in the athletic director's office. Nothing has been placed in the school records. He pointed to rule infractions, family problems, and grade problems as being inferences other than drugs, to be drawn from a student's sudden departure from participation.

When questioned about comparable dangers in driver's education, the witness stated that although danger is a factor anywhere that drugs are involved, the driving instructor does have a control at his foot and can reach the steering wheel.

Mr. Burton acknowledged that families would be expected to pay for outside services, but that school counselors would also be available for help. He did not know the drug education background of McCutcheon's counselors. Mr. Burton's own Master's education classes involved a three-hour graduate class directed to observation of drug-induced behavior.

On redirect the witness stated that the collecting of samples would not be visually observed. The student athlete will be taken into the restroom by the designated staff member of the same sex, who will listen to the process and then check temperature to verify the recency of the speci-

men. Mr. Burton admitted that he has no expertise in detecting temperature, but expects to be able to determine if the sample is warm or cold.

Kenneth Koger, superintendent of schools at TSC, referred to a document from the U.S. Office of Education entitled "Schools Without Drugs", while discussing drug problems among school age children. Similarly, Mr. Koger reviewed statistics from an Indiana school drug study which was published in 1980. The documents were admitted over the plaintiffs' objection. Mr. Koger acknowledged that the school had no comparable studies for TSC, but indicated a belief that juvenile crime and prosecution statistics for controlled substance in the county had increased between 1984 and 1986.

Mr. Koger viewed the drug problem at TSC as being similar to other student populations, and admitted that the proposed program would not be an effective means of identifying the most frequently used drug, namely alcohol. He also admitted that he personally had not observed students using drugs at TSC, and had no evidence one way or another as to whether athletes used more or less drugs than the general student population. Mr. Koger then discussed TSC's handling of hearings as provided for by the Indiana "Student Bill of Rights," as applied to a suspected drug user. He acknowledged that the school had not considered asking such students to submit to urinalysis, nor had the school considered initiating a drug program based on reasonable suspicion. Mr. Koger stated that the school does not have a regular, ongoing system of training to help teachers be better able to observe and detect drug-related behavior. The witness pointed to counselors as being available for drug counseling, but could not testify as to the specific drug education background of particular individuals.

Mr. Koger did not view intramural activities as involving the same dangers as interscholastic sports, inasmuch as the level of competition and motivation was not as high. He indicated that the present program is intended to apply to grades 9–12, but could be used at the junior high level as well.

In response to questions related to analogous dangers in shop and driver education, the witness acknowledged that the present program did not contemplate involving non-athletes. In Mr. Koger's opinion the image of the athlete stands out, and is unique, as compared with other school representatives, whether such an attitude is justified or not. He observed that an instructor is nearby in a shop class, and has given instruction prior to the use of machinery. He opined that although both shop and athletics posed potential dangers, athletics would involve more physical contact, and the supervision is less immediate due to larger groups in sports.

In response to the court's inquiry, Mr. Koger discussed the manner in which the board had set up the present program and why it was determined that it should apply only to athletes. He indicated that the committee studying the proposal had believed that the law would not allow application of the program to the whole school, but that extracurricular activities presented a separate issue. The committee then considered where it thought the most serious potential harm from the use of drugs might lie, and it was determined that the program should be applied to athletes.

The defendants then called Dr. Joseph Zabic, associate professor of pharmacology at Purdue University, who also engaged in research of substance abuse. The witness testified as to the effects of certain drugs on human behavior. Dr. Zabic stated that as a depressant, marijuana may cause drowsiness and may impair intellectual functioning in the areas of memory, timing, sensory perception, coordination, concentration, judgment, and the perception of pain and fatigue. He testified that since marijuana is smoked, its usage often involves lung disturbance in the form of bronchitis. The same drug was said, particularly when used by athletes, to involve the possibility of elevated heart rate, and an alteration of the sweating process, which can in turn effect heat loss and heat stress.

With respect to cocaine, the witness noted the drug to be a stimulant, as contrasted with marijuana, a depressant. In discussing the particularly dangerous effects of cocaine on athletes, the witness pointed to its masking effect on pain and fatigue, and its tendency to increase aggressiveness. Dr. Zabic added that cocaine also effects body temperature as well as bodily responses to temperature changes, which in high enough dosages might depress respiration, in some instances causing death. As for the effects of cocaine on the heart, Dr. Zabic testified that both increases and decreases in heart rate have been reported, and that large doses taken intravenously may cause cardiac failure and death.

Dr. Zabic then mentioned that cocaine, like marijuana, has the ability to effect both physiological and psychological responses, and that particularly in a contact sport, increased aggressiveness from the use of cocaine could result in dangerous consequences both for the user and for other players.

In discussing the effects of amphetamines on athletes, the witness referred to blunting of pain, increased aggressiveness, increased agitation, anxiety, confusion, delirium, apprehension, suppressed appetite, and, as with cocaine, possible mental depression with prolonged use. Dr. Zabic added that amphetamines could also predispose an athlete to heat stroke, and could result in profound effects on the cardiovascular system, by stimulating the heart rate and blood pressure. The witness opined that paired with the stress and tensions of an athletic event, including such sports as swimming, cross-country, and track, the "synergistic combination" of the athletic event and the drug could be very dangerous.

Dr. Zabic added that amphetamines are addictive, cause psychological dependence, and may lead to the use of a combination of drugs to counteract its effects. The witness further opined that the combination of already elevated blood pressure from the amphetamine, plus the physical exertion of the sport, could lead to stroke. In his opinion, amphetamines, having the capacity to blunt pain and increase aggressiveness and hostility, could lead to injury of not only the user, but of others as well in contact sports.

Dr. Zabic then discussed the effects of barbiturates. He described the drugs as depressants which affect the central nervous system and in turn lead to increased use and marked depression. The overall result is a sort of altered realization, depressed inhibitions, mood distortion, paradoxical excitement, psychological and physiological addiction and potentially dangerous withdrawal. The use of barbiturates was reported to be particularly dangerous in combination with other drugs such as alcohol, which could lead to death. Dr. Zabic affirmed that barbiturates could also mask the perception of pain. In the witness' opinion, although certain drugs such as the opiates will result in a pinpoint pupil, most drugs, unless taken in quantities to produce overt changes, are not easily detected, and can be similar in effect to other conditions such as deprivation of sleep. He described drug usage as existing on a continuum and agreed that frequency of use would not always be easy to detect. Dr. Zabic then discussed varying degrees of duration and onset of action dependent on dosage and the drug itself, describing marijuana as a drug which tends to accumulate and remain detectible for periods up to a month or more depending on the use. Cocaine was reported by contrast to have a relatively short duration of action with a very high psychological dependence component, resulting in repeated usage.

On cross-examination Dr. Zabic acknowledged that his work involved mostly the effect of drugs on the brain, and that his published research involved rats' brains. He pointed to alcohol as the number one drug of abuse in our society, and stated that it also has both physiological and psychological effects on a person's timing, memory, motor coordination, breathing, sweating, oral communication and general behavior. He reiterated that the effects of drugs, including alcohol, could be very subtle and difficult to detect, but added that training could be helpful. He acknowledged performance testing as a means of

evaluating current impairment of motor coordination and cognitive ability, agreeing that such tests would be a simple measure of current impairment. Although an inability to perform on the test might raise a warning of some type of problem, the witness did not feel that results would necessarily raise the suspicion of drug usage. Comparing athletic competition with, for example intramural sports, or half-time performances, the witness did not feel that the anxiety level or intensity would be equivalent. He did acknowledge, however, the risk factors of being overweight or out of shape in the context of intramural sports activities.

David Young, a history teacher and basketball coach at Harrison who acted as athletic director for the 1986–1987 school year, stated that although his training rules had formerly involved a year's suspension from sports for drinking or smoking, they now result in suspension from a percentage of events to encourage achievement of goals. From his reading and from several seminars, Mr. Young believed that there exists a 30% drug usage level among the student body and among athletes, with a high correlation between the two, contrary to popular opinion. He viewed Harrison and McCutcheon as typical in this respect, although he admitted he had never personally observed a student under the influence of drugs. He was unaware of any program at Harrison to educate teachers in observing drug usage, but believed that despite his own background in this area, urine or blood tests were necessary to detect drug usage.

The bulk of the testimony heard on December 7, 1987, consisted of witnesses presenting alternative theories and means of detecting drug usage. The first of these witnesses was Dr. Steven Danish, a sports psychologist who, referring to his own designs, expressed a preference for prevention and education programs, as opposed to urinalysis testing. He felt that if the effects of drugs are exaggerated, "a young mind will cease to believe the information disseminated." In his opinion a program should be geared to reducing stress and to training for life skills, such as the ability to avoid negative effects of peer groups without losing respect. He believed that drug testing creates a division between students and the school, inasmuch as it assumes a lack of trustworthiness, and because it is intrusive if it involves direct observation to insure validity. He also opined that due to the shorter time that cocaine remains detectible in the system, a testing program could conceivably lead someone to switch from the use of marijuana, a reportedly less harmful drug, to cocaine, so as to avoid detection. Dr. Danish testified that research indicated that students who engage in extracurricular activities such as sports, are less likely to use drugs than the general school population. In his experience he has been unaware of any drug-related sports injury.

Over objection, the witness testified about problems in NCAA drug testing programs. He stated that mandatory urinalysis had resulted in so much stress for certain individuals, that they were unable to void the bladder for up to two or three hours. Dr. Danish felt that intramural and interscholastic sports involved similar pressures and dangers because in an intramural activity, self-worth might be highly dependent on performance, and injury could be more likely, due to a lack of expertise. He objected to a perceived lack of structured counseling and rehabilitation in the TSC program, and saw no basis for making the penalty greater for marijuana than for alcohol. He also saw a discrepancy in applying the program to sports and not to such activities as shop, intramurals, and physical education classes.

The witness agreed that drug use is a serious problem, but pointed to a very recent study showing a slight decline. Dr. Danish agreed that marijuana may have impairing effects on memory, judgment, and perception, which might not be apparent to the user. He stated that some people do turn to drugs to alleviate stress, but he did not know a percentage for marijuana usage among high school students. Although the witness had spoken with some of the TSC athletes about drug education at TSC, he was unfamiliar with the drug

education program for the general school population. Dr. Danish acknowledged that he knew of no figures for persons switching from marijuana to cocaine to avoid detection. He agreed that the testing program could have a deterrent effect for some athletes. With respect to trusting students, the witness admitted that monitoring of any test involves some lack of trust, but he added that urine monitoring is different. Dr. Danish felt that having a drug-free team is a worthwhile goal, and that the proposed program might conceivably bring about that goal, but he could not say that it would. The witness stated that he had studied and read about injuries, but had never tracked whether injuries were drug related.

Dr. Danish appeared unaware that the TSC program did contain a provision for counseling, but nonetheless preferred mandatory rather than suggested counseling. He acknowledged that the necessity of seeking and paying for counseling might have some positive aspects, but objected to the focus of the TSC program. The witness was unfamiliar with the portion of the program allowing reduction of penalty by counseling. He acknowledged that prevention and treatment programs have had some limitations in terms of recidivism. Dr. Danish viewed stress as a very individual phenomenon and felt that swimming and crosscountry might produce less stress than other sports. He believed that monitoring urination even without visual observation could cause discomfort and leave a negative impression in terms of privacy.

Two non-party student athletes were allowed to register their objections to the program. Each expressed discomfort at being singled out as an athlete and about confidentiality. Neither was aware of the educational aspects of the unimplemented program. One student who testified that she did not intend to sign the form, expressed that she hopes to earn a college scholarship from swimming. The witness voiced a concern that her medication for tendonitis might result in a positive test result. She knew of high school students on drugs and felt that, although not al-

ways, drug usage should be detectible by observation.

Dr. Beryl Rosenthal, a cultural anthropologist, discussed concepts of privacy, concluding that adolescents, particularly females, generally consider the monitoring of urination, even without visual observation, to be a breach of cultural taboo. On cross-examination the witness stated that this is true even if, on a daily basis, athletes use communal showers and bathrooms. Dr. Rosenthal admitted that adolescents tend to resent any monitoring of behavior. She felt that urinalysis in a medical context lessened the taboo effect.

Michael Denton, an alcohol and drug abuse counselor, recommended trained observation over random drug testing due to the flaws he deemed to be present in testing procedures. He referred to two Indiana schools which use student assistance programs focusing on trained observation and counseling. Mr. Denton preferred mandatory counseling to TSC's recommended counseling and viewed the discrepancy in penalty for alcohol and marijuana as unsound. He was himself unaware of any drug-related athletic injuries.

On cross-examination, the witness stated that there could be many reasons for reduced motivation. He discussed with approval a method of specific incident referral for urinalysis testing. He acknowledged that a person "in love" with a drug will go to any lengths to protect drug usage once drug dependency has developed. Mr. Denton spoke of drug testing as an effective adjunct to drug treatment, admitting that recidivism is very high in drug usage. In conjunction with this thought, he viewed negative consequences as helpful, if used correctly. The witness had no objection to suspension of an athlete for breach of training rules. He admitted that student assistance programs do not detect all drug users in a school. On redirect the witness stated that generally the more dependent a person is on a drug, the more easy it is to detect abuse.

The plaintiffs then called Charles Coffin, of the Indiana State Police Department, who also discussed observation as a means

of drug detection. Sergeant Coffin did not consider it necessary to use random drug testing to detect abuse, speaking in terms of police practices in dealing with department employees. He stated that the department viewed drug testing as an unnecessary expense, and saw trained observation as sufficient in terms of safety. He discussed additional methods of testing taught to troopers, such as field sobriety, horizontal gaze nystagmus, breathalyzer, and intoxilyzer tests. Plaintiff's Exhibits 5 and 7 were admitted over objection. These were materials used by the department to train for observation of impairment from drugs.

On cross-examination the witness acknowledged that he had no statistics as to the effectiveness of the department program. In general he agreed that drug-impaired persons may not realize the extent to which they are impaired. On redirect Sergeant Coffin stated that the department generally operates on a basis of reasonable suspicion.

Dr. Odie Bracy, a clinical neuropsychologist, presented a method of using computer software to measure the speed and accuracy of processing sensory input. He described the method as applicable to sports for determining the current impairment of cognitive ability and motor reflexes, but admitted that the exercises would not indicate the cause of low performance. Dr. Bracy recommended establishment of pre- and post-measures of performance, and cross-checks with the performance of others. The exercises could be performed in fifteen minutes and would cost about $100.00 for the software. The witness envisioned statewide norms for each sport, to be used to indicate which participants could safely play in terms of normal responses. Dr. Bracy agreed, however, that the simplest, most concrete way to test for drugs is urinalysis. He also admitted that his method did not necessarily show what a player might do in a real life situation.

On December 8, 1987, the court heard the testimony of Dr. Robert Forney, who directed his comments to flaws perceived in the TSC drug program. He felt that drawing numbers lent itself to unfairness, and preferred the use of random number tables. He feared that a random draw might lead to false conclusions based on the chance element of the selection. He questioned maintenance of confidentiality, and expressed concern about certifying that a chosen laboratory could actually do its assigned job. According to Dr. Forney, a certification process for this purpose is not yet in effect. He felt especially concerned where a program could involve a penalty, rather than simply, for example, a counseling follow-up. The witness stressed the importance of adequate compensation for the laboratory, and judged that in order to make a profit, payment would need to be more than $30.00–$35.00 per assay. He did not feel one could otherwise expect good results.

Dr. Forney described the mass spectroscope as the most reliable testing device in the field of urinalysis, but saw the method as limited by the training of the user, and by potential problems with maintenance. He expressed a concern about attempting to detect a large number of drugs, particularly steroids, a category described by Dr. Forney as numerous and difficult to test.

The witness then detailed his own experiments with passive inhalation, having identified cannabinoids in urine as long as five weeks after inhaling marijuana smoke for two hours in the back room of a trailer. The experiment also showed that urinalysis was not an indicator of when the drug had been inhaled.

The witness felt that in the event of passive inhalation or a positive showing from prescription drugs, the athletic director would need a Ph.D in science to determine if sufficient justification for such a positive showing had been given, at least in terms of interpreting the results. He acknowledged, however, that consultation with an expert could serve this purpose.

With respect to comparable hazards from drug use by athletes as opposed to students in general, the witness thought that individual circumstances such as the degree of dexterity required for an activity, would control his answer. He did not feel

that the TSC program provided an accurate means of obtaining a sample, and felt that the only means of eliminating the risk of inaccurate samples would be observation. He gave examples of how non-visual observation could be enhanced to reduce the risk of unreliable samples. The witness did not feel that the TSC program was specific enough to detect drug use.

During cross-examination Dr. Forney acknowledged that activities such as football, basketball and diving could produce enhanced situations of risk from drug usage. He affirmed that the urinalysis methods used in his own laboratory had been used to support convictions. These methods included combinations of GCMS, EMIT, TLC, and other means of detection. The witness confirmed that certain drugs listed on defendant's exhibit "K", a toxicology report from the school's chosen laboratory, could be identified using the methods he had described, but with no guarantee against false positives, primarily because of the possibility of human and instrumental error. The witness felt that a laboratory should be required to show that it has taken all possible precautions, and all concerned should have a common understanding about the possibility, however remote, of false positives.

In reference to the passive inhalation experiments, Dr. Forney recalled that the equivalent of 20 "one-gram joints" were smoked over two 15–minutes periods. In the actual setting, within a two-hour period, a 10–gram pipe was smoked two times, with each pipe taking 15 minutes. The witness acknowledged that this would also equate to 10 or 12 people smoking marijuana in an 8' × 10' room within a two-hour period. He did not know how this experiment would apply to presence at a party or a rock concert where marijuana was being smoked.

The witness expressed concern that the mechanisms of defending against a positive result, such as consultation with a toxicologist, were not adequately detailed in writing. However, he acknowledged that procedures might vary widely according to circumstances. In his opinion, the less punitive in nature a program is, the less standardized these mechanisms need to be. The witness was not fully familiar with the sequential consequences spelled out in the TSC program, and he agreed that some immediate negative consequence would "make sense." Dr. Forney also felt that the more punitive a program is in nature, the more precaution is required in collecting samples. He felt that to prevent a test subject from scooping water from the toilet to dilute the sample, there should be dye placed in the toilet bowl. He acknowledged the worth of training rules, and affirmed that there need not be impairment under training rules to suspend a student caught drinking, smoking, or taking drugs. He believed, however, that impairment would be a significant consideration with respect to a safety goal.

In Dr. Forney's opinion the methods of analyses should also be spelled out in the program. He did feel that EMIT followed by GCMS was the proper procedure, but as a parent, he thought that the protocol should be part of the document. He did not view the EMIT as adequate by itself, but thought it appropriate as an initial survey. Dr. Forney acknowledged that part of his testimony involved personal values rather than scientific judgments. He believed that urine testing could be very valuable in controlling the use of drugs by students, but thought that this program "would not do it." He acknowledged that the focus of his concern was that the program be competently administered.

For the second time Jacob Burton took the stand. He testified that assuming implementation and a positive result, a male student athlete will be notified of selection during a free time or study hall, whereupon that student will report to the witness' office when ready to provide a sample. With Mr. Burton, the student will proceed to a stall containing dye in the stool. The witness will provide a sealed container and remain outside the stall. Once given, the sample will be capped. Upon returning to the witness' office the student will provide his I.D. number. From a locked file for which only the witness has a key, Mr. Burton will check the accuracy of the num-

ber given by the student. The number will be written on the lid which will be initialed by the student and Mr. Burton, dated, and time recorded. The student will accompany Mr. Burton to a special locked refrigeration unit, where the sample will remain until, via Mr. Burton who holds the only key, the toxicologist picks up the sample the next day. The only variance for a female athlete will be in the collection, labelling and storage portions of the process. The girls' physical education teacher will replace Mr. Burton for collection purposes, and will be present with Mr. Burton during labelling and storage.

If a student has been confirmed as positive, he or she will be called in and parents will be notified. If the results are disputed, a meeting will be arranged and any prescription medications or other drugs for medical purposes will be taken into account. If desired by the parents, a toxicologist will be present to help evaluate explanations. The parents would also be allowed to submit information and consult other authorities. The final decision would be made by Mr. Burton. The witness stated that the program will involve a test for alcohol. He acknowledged that the procedures that he described are not written down, and, although already approved by the committee, they have not been reviewed by the board. He admitted that the details could be changed or modified by the board. Mr. Burton stated that if a student did not know and did not report that a particular substance might have affected the test, the information would escape consideration. He acknowledged that a specific toxicologist has not been designated to help resolve disputed test results. He testified that he would type his own crossreference list, but he could not state exactly the methods to be used in the other high school. He knew that procedures would be similar and would require committee approval. On redirect Mr. Burton affirmed that the board normally sets policy and appropriate staff members carry it out.

The deposition of Dr. Robert DuPont was admitted as Defendants' Exhibit "J". As a psychiatrist and author of literature on drug usage, Dr. DuPont reviewed trends, motivations, effects, and statistics related to the use of drugs. He confirmed the testimony of Dr. Forney that the GCMS was a highly reliable method of identifying a drug's presence in the system. He opined that the use of drugs would involve a substantially elevated risk for athletes as opposed to non-athletes because of the impairing effects on motor and mental performance. Contrary to much of the other testimony in this case, Dr. DuPont apparently believed that urinalysis does provide some indication of recent use, and that a positive test would raise an inference of some impairment. Dr. DuPont saw some merit in performance testing, inasmuch as he considered impairment to be generally difficult to detect, even with training; but he did not view behavioral methods to suffice in pinpointing drug usage without, for example, blood or urine testing.

With respect to the effects of passive inhalation of marijuana fumes, Dr. DuPont did not think the experiments done in this area took place in realistic conditions. The deponent saw the inclusion of negative consequences from drug use as being an important part of a drug program in terms of getting a person to discontinue usage.

Dr. DuPont acknowledged two opposing influences related to the use of drugs by athletes. On the one hand the athlete could be viewed as being health and performance oriented. On the other hand he or she might tend to be a risk taker. On the balance, Dr. DuPont believed that drug use among athletes would be similar to drug use among non-athletes.

The deponent acknowledged that marijuana, compared with cocaine, remains detectible for a much longer period of time. He confirmed that non-visual observation would reduce the assurance against false negative results, but pointed to various techniques for providing a measure of assurance without visual observation. Dr. DuPont agreed that other school related activities could involve enhanced situations of risk from drug usage. He viewed intramural athletics as involving less risk than interscholastic sports, but he did not feel especially qualified to form this opinion.

He did recognize great importance in the competency of a testing laboratory. He did not himself know of any drug-related athletic injuries. Dr. DuPont was of the opinion that urinalysis for alcohol had some practical drawbacks because of its capacity to clear the system so rapidly. The deponent endorsed self-referred counseling, but thought that negative consequences played an important role in deterring drug usage.

## III.

## LAW

■ To bring a successful § 1983 action, the plaintiffs must prove that the defendants have deprived them of a right secured by federal law or the Constitution while acting under color of state law. *Bergren v. City of Milwaukee*, 811 F.2d 1139 (7th Cir.1987). The defendants acknowledge, and the law is clear, that the actions complained of in this case were initiated under color of state law. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

The plaintiffs contend that the TSC drug program violates their constitutional rights by: requiring them to submit to an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution; interfering with legitimate expectations of privacy; violating the due process clause of the Fourteenth Amendment to the United States Constitution; violating the equal protection clause of the Fourteenth Amendment to the United States Constitution; and, limiting participation in interscholastic sports to students who waive the above constitutional rights.

It is generally agreed that the central issue in this case is whether TSC's pre-implemented drug program constitutes a violation of the plaintiffs' Fourth Amendment rights, by requiring them to sign a consent to random urinalysis testing, as a pre-condition to participation in interscholastic sports.

The parties have submitted extensive reviews of cases pertaining to urinalysis testing for drugs. Reams of commentary have been produced recently relative to the issue of drug testing. *See, e.g., Behind the Hysteria of Compulsory Drug Screening in Employment: Urinalysis Can Be a Legitimate Tool for Helping Resolve the Nation's Drug Problem if Competing Interests of Employer and Employee Are Equitably Balanced*, 25 Duq.L.Rev. 597–955 (1987); *Testing for Drug Use in the American Workplace: A Symposium*, 11 Nova L.Rev. 291–815 (1987); Herman and Bernholz, *Negligence in Employee Drug Testing*, 92 Case & Com. 3–8 (1987); Keenan, *Shoemaker v. Handel and Urinalysis Drug Testing: Looking for an American Standard*, 21 Ga.L.Rev. 467–504 (1986).

In various contexts the courts have determined the constitutional validity of urinalysis on a case-by-case, factually-oriented basis. Some have found urinalysis to be a reasonable search in the circumstances. *See, Jones v. McKenzie*, 833 F.2d 335 (D.C. Cir.1987) (holding that the compulsory testing of an employee who had direct contact with school children and their physical safety was not unreasonable where conducted as part of an employment-related medical examination, and where there was a nexus between the testing and the safety concern); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170 (5th Cir. 1987), *pet. for cert. filed*, 56 U.S.L.W. 3028 (U.S. May 27, 1987) (holding that drug testing for Customs Service employees who requested transfer to sensitive positions was constitutional); *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987) (finding constitutional the mandatory drug testing of prison employees on the basis of an environment "fraught with serious security dangers"); *Shoemaker v. Handel*, 795 F.2d 1136 (3rd Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (allowing the drug testing of jockeys on the basis of the highly regulated nature of the horseracing industry); *American Federation of Government Employees v. Dole*, 670 F.Supp. 445 (D.D.C.1987) (holding a drug testing plan to be reasonable on its face where employees in sensitive positions were to be tested, where the plan showed a concern for personal privacy, where no criminal use would be made of the results, and where the employees had reasonable

advanced notice and familiarity with testing procedures). *See also NFFE v. Weinberger,* 818 F.2d 935 (D.C.Cir.1987); *Rushton v. Nebraska Pub. Power Dist.,* 653 F.Supp. 1510 (D.Neb.1987); *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264, 1267 (7th Cir.1976), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976).

Other cases have found urinalysis to be an unconstitutional violation of Fourth Amendment rights. *See, e.g., Taylor v. O'Grady,* 669 F.Supp. 1422 (N.D.Ill.1987) (granting a permanent injunction against a mandatory program of urinalysis drug testing for correctional employees, where refusal to submit would result in termination of employment); *Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987) (holding that drug testing of police academy cadets was unconstitutional absent individualized suspicion; and holding that the plaintiffs had not freely waived their rights by consent); *Local 318 v. Township of Washington,* 672 F.Supp. 779 (D.N.J.1987) (holding that police employees have greater privacy expectations than persons in highly regulated industry and that mandatory random urinalysis is unreasonable absent a showing of widespread drug abuse or individualized suspicion); *Caruso v. Ward,* 131 A.D.2d 214, 520 N.Y.S.2d 551 (1987) (holding that reasonable suspicion is required to mandate submission to random drug testing of current and future members of an Organized Crime Control Bureau as a condition of assignment); *Matter of Patchogue–Medford Congress of Teachers v. Board of Education,* 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987) (requiring reasonable suspicion for mandatory urinalysis of probationary teachers on the basis of state and federal constitutional law); *Horseman's Benevolent & Protective Ass'n v. Venezia,* No. 87616, slip op. (Mass.Super.Ct.1987) (granting a permanent injunction against coercion of racing licensees to submit to a program of urine testing). *See also, e.g., Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga.1986); *City of Palm Bay v. Bauman,* 475 So.2d 1322 (Fla.App.1985); *Fraternal Order of Police v. Newark,* 524 A.2d 430 (N.D.Super.1987).

In a college context, which this court considers distinct from a public high school setting, the courts have specifically considered urinalysis drug testing of athletes. In *Hill v. National Collegiate Athletic Association,* No. 619209, slip op. (Cal.Super.Ct. Nov. 19, 1987), the court found a drug testing program to be overly broad and vague, as well as lacking in a compelling need, but apparently it later revised its opinion to hold against the plan on the basis of the state constitution. In *Bally v. Northeastern University,* No. 87–1178, slip op. (Mass.Super.Ct. Nov. 30, 1987), the court held that urinalysis testing in the context of requiring a consent agreement as a prerequisite to participation in varsity sports, constituted a violation of privacy and an unreasonable search and seizure, particularly where there were less intrusive means of protecting the interests of the college and where there was no significant drug abuse problem.

These cases, both the ones allowing and the ones not allowing urinalysis testing are enlightening only to a limited extent. Since both the standard for a search and the privacy expectations related to a search will vary according to context, the court will focus its attention on cases dealing with legally protected rights and expectations of students in a public school setting. See, *O'Connor v. Ortega,* — U.S. —, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987).

This court is not unfamiliar with cases involving student rights. In *Doe v. Renfrow,* 475 F.Supp. 1012 (N.D.Ind.1979), it was held that walking a specially trained dog up and down classroom aisles to sniff for drugs was not a search, and that no Fourth Amendment rights were violated by ordering a student to empty her purse; however, a nude search based only on the dog alert was unreasonable. The Court of Appeals for the Seventh Circuit upheld this decision on all issues but immunity, and the matter was returned to this court for a determination of damages. *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980). The rehearing of that case was denied *en banc* with four judges dissenting. *Doe v. Renfrow,* 635 F.2d 582 (7th Cir.1980). Petition

for *certiorari* was denied, with Justice Brennan dissenting. *Doe v. Renfrow,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).

Subsequent cases involving sniffer dogs in schools have distinguished the search of objects from the search of persons, and have tended to view the sniffing of students as a search requiring reasonable suspicion. See, *Horton v. Goose Creek Independent School District,* 690 F.2d 470, 477 (5th Cir.1982), *reh. denied,* 693 F.2d 524 (1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Jones v. Latexo Independent School District,* 499 F.Supp. 223 (E.D.Tex.1980). See also, Bennett, U.S. Department of Education Publication, "What Works: Schools Without Drugs," at 53 and Notes 13–16, admitted as Defendant's Exhibit "E" in this case. The court notes that the above cases were decided before *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 773, 83 L.Ed.2d 720 (1985), which set the standard for school searches to be reasonableness in all the circumstances.

The United States Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officials, and these protections, set forth in the Fourth Amendment, will apply to searches conducted by school authorities. *Id.*

■ Under a Fourth Amendment analysis, the initial question is whether the disputed activity is a search. With few exceptions, courts have held that mandatory urinalysis is a search and seizure, at least in the context of those cases. *E.g., Berry v. District of Columbia,* 833 F.2d 1031, 1034, n. 14 (D.C.Cir.1987); *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264, 1266–67 (7th Cir.1976); *American Federation of Government Employees v. Dole,* 670 F.Supp. 445 (D.D.C.1987); *Taylor v. O'Grady,* 669 F.Supp. 1422 (N.D.Ill. 1987); See also, Keenan, *Shoemaker v. Handel and Urinalysis Drug Testing,* 21 Ga.L.Rev. 467, 476, n. 54 (1986) (collecting cases). *But see Turner v. Fraternal Order of Police,* 500 A.2d 1005 (D.C.App.1985) (Nebeker, concurring) (urine collection viewed as similar to voice and handwriting exemplars). Having reviewed these and other relevant cases, this court concludes that the privacy interests related to urinalysis testing for drugs are such that Fourth Amendment rights are clearly in question. Accordingly, mandatory urinalysis testing for drugs will normally involve a legally protectable search, and the proposed urinalysis program disputed here would likewise constitute a search.

Before proceeding to the question of whether the disputed testing is reasonable, the court observes that the facts and procedural posture of this case continue to hint of some tensions related to standing or justiciability. For a recent and thorough discussion of standing, see *Shakman v. Dunne,* 829 F.2d 1387 (7th Cir.1987), holding that the plaintiffs had no standing to attack the constitutionality of alleged political patronage hiring practices. See also, *Committee for a Sane Nuclear Policy v. Indianapolis,* 668 F.Supp. 1211 (S.D.Ind. 1987).

In *Everett v. Napper,* 825 F.2d 341 (11th Cir.1987), *modified,* 833 F.2d 1507 (11th Cir.1987), distinct but related tensions were resolved by a finding that there was no search where a fireman refused to consent to urinalysis and was dismissed from his job without being tested. Approaching similar problems in a different way, another court found a lack of standing for one of the plaintiffs who attempted to attack the facial validity of the school's drug program. See *Anable v. Ford,* 653 F.Supp. 22, 32–34 (W.D.Ark.1985), *modified,* 663 F.Supp. 149 (W.D.Ark.1985).

Without suggesting that these cases should control here, they do have some relevance. The plaintiffs complain about a plan which has not yet prevented their participation in sports or otherwise affected them in any way. Conceivably, for a variety of reasons, they may never be the subject of urinalysis testing for drugs. They have refused to sign a consent form, which, if the program is implemented, will result in deprivation, not of a property or liberty interest, but of participation in an extracurricular program. Any number of events

unrelated to this suit might preclude them from participation. They could take up other interests, otherwise not qualify, or move away between now and implementation of the program. They might even decide to sign the consent form and never be selected.

At this juncture it is necessary to emphasize the narrow and limited scope of this decision. The focus here is on a paper proposal not yet executed and not an operational enterprise. For purposes of analysis, the discussion will assume that these plaintiffs have the necessary standing to raise a constitutional challenge to this written unexecuted plan. Such an assumption is most generous.

■ To further delineate this court's task, the issue presented is not whether school officials are generally authorized, absent individualized suspicion, to conduct random urinalysis testing for drugs in the total student population. That question could arguably involve interests not here at stake. Undoubtedly the broader question will be addressed by some court at a time in the near future. Instead, this court addresses whether the defendants' program violates, on its face, any legally protected rights or interests of these plaintiffs as student athletes, since absent this role they would not be confronted with the possibility of the intended search. The broader issue of drug testing in the general school population will be explored, however, as background for determination of the narrower issue.

■ Over the course of the last few years, the Supreme Court of the United States has clearly defined the constitutional rights of students in the public school setting, as different than rights enjoyed in other settings. Although it remains true that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), that concept has been considerably narrowed and refined by subsequent cases. The protection of the Constitution does not extend, for example, to

offensively lewd and indecent speech. It is within the school's authority to impose sanctions for the use of such speech where a student has been adequately warned. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

Neither do public high school educators "offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood School Dist. v. Kuhlmeier*, —— U.S. ——, ——, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988).

In *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Supreme Court addressed Fourth Amendment protections as they relate to the rights of students in public schools. Announcing a test specific to students in a public school setting involving a search by school authorities, the Supreme Court stated that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances of the search." *T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 743–44.

In *T.L.O.*, the Supreme Court reasoned that although school children have legitimate expectations of privacy, these expectations must be balanced with the school's legitimate need to maintain an environment that is conducive to learning. Accordingly, school officials need not obtain a warrant to conduct a search, nor are they subject to a probable cause standard of suspicion. *Id.*; *Martens v. Dist. No. 220, Bd. of Educ.*, 620 F.Supp. 29 (N.D.Ill.1985).

■ To be reasonable, a school search, like searches elsewhere, must be justified at its inception, and its scope must be reasonably related to the circumstances which initially justified interference. *T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 744, citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). More particularly in a school setting, under ordinary circumstances, a search of students by public school authorities must be grounded on reason-

able suspicion that it will turn up evidence that the student has violated or is violating a law or school rule. *T.L.O.*, 105 S.Ct. 733, 744.

However, in *T.L.O.*, the Supreme Court expressly left open the likelihood, and clearly implied, that searches in a school setting will not necessarily require individualized suspicion. In so doing the Court observed that exceptions to such a requirement are generally appropriate only if privacy interests are minimal, and if there are safeguards to protect an individual's reasonable expectations of privacy from being subject to the discretion of the official in the field. *T.L.O.*, 105 S.Ct. 733, 844 n. 8, citing *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

Thus, the question for this court in examining "justification at the inception," is whether the circumstances peculiar to this case will operate to "justify school authorities in conducting searches unsupported by individualized suspicion." *T.L.O.*, 105 S.Ct. 733, 844 n. 8. The plaintiffs acknowledge that the Supreme Court has left a crack in the door with respect to school searches absent individualized suspicion. They do not see the crack as being wide enough to allow this program. In simple terms, that is the question in this case.

The second prong of the *T.L.O.* reasonableness test involves a determination of whether a search is permissible in scope. To satisfy this prong, the measures adopted must be reasonably related to the objectives of the search, and not excessively intrusive in light of the age and sex of the student and the nature of the infraction. *T.L.O.*, 105 S.Ct. at 744. In reference to this case, the prime objective of the searches intended by the TSC program is drug-free student athletes. The targeted students are male and female high school athletes, roughly between the ages of 14 and 18 years old. The nature of the targeted offense is the use of drugs which are prohibited by law, school rules, and training rules. The proposed testing program is contained in a written plan which provides for notice at the beginning of the sports season, and an opportunity to explain any test confirmed as positive. No academic repercussions are contemplated, and the collecting of urine will not be visually observed.

Boiled down to a very basic level, the *T.L.O.* test involves a balancing of needs, primarily the need to search against the invasion which the search entails. *T.L.O.*, 105 S.Ct. at 741; *Darryl v. Coler*, 801 F.2d 893, 901 (7th Cir.1986). The privacy expectations of the plaintiffs are considered, not on a subjective basis, but rather, according to whether their expectations are recognized as legitimate by society. *T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Taylor v. O'Grady*, 669 F.Supp. 1422 (N.D.Ill. 1987). This court does not consider local popularity or the lack of it to be a crucial factor in this portion of the analysis. The court does not and will not function in the capacity of a judicial plebiscite in this case.

In keeping with *T.L.O.*, the balancing process in this case must be conducted in the context of all the circumstances. The circumstances here involve the plaintiffs as part of the unique sub-population of student athletes. This court must determine to what extent, if any, the rights and privacy interests of the plaintiffs are influenced by virtue of their being athletes. The question of drug testing among high school athletes is relatively unchartered legal territory.

Even in the general school population, urinalysis in the high school context has been considered in a limited number of cases, all dealing with a search as conducted or a plan as applied to the whole population. In *Anable v. Ford*, 653 F.Supp. 22 (W.D.Ark.1985), *modified*, 663 F.Supp. 149 (W.D.Ark.1985), the court determined that a search requiring a student to disrobe from the waist down while a school official of the same sex visually observed urination, was an unreasonable search. In *Odenheim v. Carlstadt–East Rutherford R.Sch.*, 211 N.J.Super. 54, 510 A.2d 709 (1985) the court found that a school-wide urinalysis program violated state and fed-

eral law as an unreasonable search and seizure and as a violation of privacy and due process rights.

An additional matter addressed in *T.L.O.* constitutes, in the opinion of this court, one of the unique circumstances prevailing in a public school setting, that circumstance being the relationship between the student and school officials. In *T.L.O.*, the Supreme Court clearly laid to rest the doctrine of *in loco parentis* as a theory of the school's immunity from suit. This court does not read *T.L.O.* to negate, however, the reality that school officials do, in effect, often relate to students in a protective and parental way.

Justice Powell, with whom Justice O'Connor joined in a concurring opinion, described the student-teacher relationship as follows:

> The special relationship between teacher and student also distinguishes the setting within which school children operate ... there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education. *T.L.O.*, 105 S.Ct. at 748.

■ While admittedly not a proper basis for immunity, particularly in light of compulsory attendance laws, and while not a justification for running roughshod over the legally protected rights of students, even for admirable purposes, the special relationship of the school to its students, or more precisely here to its student athletes, is one of the circumstances to be evaluated in determining the reasonableness of the disputed drug program. Despite arguable mistakes or presumptions in the earlier stages of attempting to set up the program, the good will and positive motivations of the defendants in this case cannot seriously be questioned, nor are they. More importantly, however, the revised version of the program takes into proper account the Due Process, Equal Protection, and privacy interests of the student athlete, as discussed more fully below.

To maintain a suit under the Due Process Clause of the Fourteenth Amendment, the plaintiffs must be deprived of life, liberty or property without due process of law. *Upadhya v. Langenberg,* 834 F.2d 661 (7th Cir.1987); U.S. Const.Amend. XIV. No process at all is required if none of these interests is at stake. *Id.*

■ These plaintiffs have argued that they have a property interest in participating in interscholastic athletics and a liberty interest in freedom from the stigma which would attach if suspended on the basis of a positive drug test. Clearly, participation in interscholastic athletics is improperly characterized as a constitutional right protected by the Fourteenth Amendment of the United States Constitution. Without minimizing the important benefits to be gleaned from high school sports, the school correctly observed in its program and policy statement, that participation in its athletic programs is a privilege and not a right.

A number of circuits have determined specifically that the privilege of participating in interscholastic athletics falls outside the protection of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *See, e.g., Hamilton v. Tennessee Secondary School Athletic Association,* 552 F.2d 681 (6th Cir.1976); *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155, 1157–58 (5th Cir.1970). See also, *Hawkins v. National Collegiate Athletic Association,* 652 F.Supp. 602, 610 (C.D.Ill.1987), and cases cited therein.

Particularly in a high school setting, where school officials are vested with broad discretion in administering such programs, where the rights of public students are protected in a limited way, and where no contract issues are involved, participation in sports cannot be viewed as involving a liberty or property interest. Even if there were such an interest involved, the Fourteenth Amendment does not prohibit a deprivation where adequate due process procedures are provided.

Guidelines for adequacy of procedural due process can be found in case law and in the laws of Indiana. The Indiana legislature has enacted provisions defining the

rights and responsibilities of various members of the school community. See, IC 20–5–1–1 *et seq.* These enactments serve, among other purposes, to delineate the breadth and limitations of the authority vested in school officials to operate schools. This body of law, known as The School Powers Act, was later modified to include the provisions commonly referred to as "The Student Bill of Rights." See, IC 20–8.1–5–1 *et seq.* The rights and values of the state-enacted Student Bill of Rights remain alive and well here, and the school authorities remain bound by same. For an example of the scope of the School Powers Act, see *School City of Gary v. Gary Teachers Union,* 152 Ind.App. 591, 284 N.E.2d 108 (1972).

If an action involves suspension or denial of access to school services for a period of ten days or less, the school very likely must provide oral or written notice of charges, an explanation of evidence and an opportunity to present the accused's side of the story. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Lamb v. Panhandle Community Unit School Dist. No. 2,* 826 F.2d 526, 528 (7th Cir.1987). The penalty system set forth in the TSC program expressly involves no academic repercussions, and, in any event, the program provides for an opportunity to be heard.

■ The Equal Protection Clause prohibits any state from denying a person within its jurisdiction the equal protection of the laws. U.S. Const.Amend. XIV. Attorney General Opinion No. 86–055 (Oct. 22, 1986) n. 27. A claim under this clause with respect to a drug testing program is subject to rational basis review. *Id.* The strict scrutiny standard is used only when a fundamental right is at stake or a suspect class is placed at a disadvantage by the program. *Id.,* citing *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). *Id.; Racetrac Petroleum, Inc. v. Prince George's County,* 601 F.Supp. 892, 913 (D.Md.1985). See also *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *Cole*

*v. Greenfield–Central Community Schools,* 657 F.Supp. 56 (S.D.Ind.1986).

By analogy to cases examining the constitutional validity of legislation, a classification will be examined as to whether it is rationally related to a legitimate governmental purpose. *Id.* citing *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985). This inquiry will in turn involve looking at the program to determine (1) if it has a legitimate purpose, (2) if school officials reasonably believed that use of the classification will promote that purpose. *Id.,* citing *Western & So. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981).

In *Lamb v. Panhandle Community Unit School Dist. No. 2,* 826 F.2d 526 (7th Cir.1987), the consequences flowing from differences in grade point averages did not violate the Equal Protection Clause. *Id.* at 530. Neither here do the consequences flowing from the voluntary choice of participation in interscholastic sports violate the Equal Protection Clause, unless within the program itself there exists a violation, as discussed in *Haas v. South Bend Comm. School Corp.,* 259 Ind. 515, 289 N.E.2d 495 (1972); and *Sturrup v. Mahan,* 261 Ind. 515, 305 N.E.2d 877 (1974).

This program involves no equal protection problems. It is applicable to all students, male and female, who seek participation. In reference to singling out athletes, there remains with the plaintiffs the option of not being an athlete and thereby avoiding the possibility of drug testing. Student athletes are aware of the conditions in advance of becoming involved in the season. The school imposes on the student athlete neither the unique status of athlete nor the proposed urinalysis testing. The only consequence of refusing to sign the form is loss of participation in a voluntarily chosen activity which qualifies solely as a privilege.

■ The plaintiffs argue that the courts have ceased to make a distinction between privileges and rights. This might in some instances be true where the issue involves an "entitlement." *Upadhya, su-*

*pra.* Participation in interscholastic sports involves no such concept, nor are there any contract or economic factors as there are in some cases in a college context. A student's aspirations for a college scholarship from high school sports, although admirable and of understandable importance to the student, do not establish any legally protected interests.

## IV.

### ANALYSIS

Having carefully reviewed the law, the arguments and the evidence, including testimony, exhibits and depositions, the court finds that:

The urinalysis program envisioned by TSC school officials does constitute a search under the meaning of the Fourth Amendment of the United States Constitution. The rights of public school students to privacy and freedom from unreasonable searches and seizures are protected by the Constitution, but by a unique standard that is tailored to the circumstances found in public schools. Inherent in these unique circumstances is the fact that comprehensive authority is vested in the states and in school officials to prescribe and control conduct in the schools insofar as this authority is exercised in a manner consistent with fundamental constitutional safeguards. This includes the right to be protective of an environment conducive to learning, and beneficial to the student in terms of health and safety. These interests of the school must be balanced against a student's legitimate expectations of privacy.

The court does not doubt that there are subjective privacy interests at stake here, but to be recognized by law, expectations in this regard must be legitimized by society. As a general matter, there are objective privacy interests involved in monitoring urination, even if the monitoring is nonvisual. However, surrounding circumstances, such as reduced expectations of privacy, efforts to be sensitive to privacy interests, and important government interests, may tip the balance in favor of finding a reasonable search.

The school's interest here is maintenance of a drug-free athletic program, primarily for the health and safety of participants. Although there is no evidence that these plaintiffs use illegal or illicit drugs, and no direct evidence that TSC swimmers or cross-country runners use drugs, there has been presented evidence that twenty to thirty percent of students nationwide are drug users. The evidence also supports the conclusion that usage among student athletes runs at a similar percentage level. The pilot program at McCutcheon turned up five out of sixteen marijuana users from the baseball team, although four of these were below a positive reading. There was some vague suggestion that a very recent survey showed drug usage in general to be on a slight decline, but overwhelmingly it was shown, and it was generally agreed by all concerned, that the use of drugs, especially in the public schools, is a matter of serious national concern. Where there are social concerns at stake, wide latitude will be given to school officials. The law is clear that this court's role is not to set aside decisions of school administrators, even where the school's position might be viewed as lacking in wisdom or compassion, which here, it is not so viewed. See, *Hazelwood School District v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214; *Lamb v. Panhandle Community Unit School Dist. No. 2,* 826 F.2d 526, 530 (7th Cir.1987); *Pesce v. J. Sterling Morton High School,* 830 F.2d 789 (7th Cir.1987).

The plaintiffs argue that despite good intentions of school officials, the approved program involves Fourth Amendment, Due Process, Equal Protection, and privacy rights of the students. According to the plaintiffs, urinalysis testing, in the context of this case, is highly intrusive and other means of detection such as "education and prevention programs, trained observation and individualized intervention, student assistance programs, breathalyzers, neuro-behavior or performance testing, or even individualized suspicion testing," should have been chosen instead.

At trial, various witnesses presented the above alternatives and reasons for their selection. However advantageous these programs might be, the question in this case is not whether the school board made the best choice of program. The question is whether the Constitution of the United States prohibits this school board from adopting and implementing this drug program. Under *T.L.O.*, the answer to that question lies simply in whether the program is reasonable in the particular circumstances of this case. Any program devised by a school system to test for drugs, to be reasonable, must take into consideration the student's legitimate privacy interests, his or her right of equal protection under the law, and his or her right to due process of law. A testing program aimed at the general school population and involving penalties related to academic life, would arguably involve issues not present here.

The interscholastic athletes of a public school system typically enjoy a unique identity within the school community. Inherent in this identity are specific privileges and public recognitions. The student athlete is generally viewed by the broader community with admiration and respect. These elements of the student athlete's position in the school community do not, in and of themselves, suffice to single out student athletes for testing. The status of the student athlete does, however, tend to extend the athlete's relationship with the school beyond the confines of the school day.

Interscholastic athletes voluntarily take on certain concrete responsibilities not imposed on other students. By choosing to participate in the sports programs offered by the school, student athletes commit themselves to a system of discipline in the form of rigorous practice sessions, grade requirements, and training rules which specifically prohibit the use of alcohol, tobacco, and drugs. These prohibitions are generally understood to extend beyond the school day, inasmuch as the purpose of the prohibitions is, not only to conform the athlete to school regulations and the law, but to protect his or her health and safety, and to enhance both the honesty and quality of performance in the athletic arena, ideally not for the public, but for the student athlete's sake.

The student athlete, along with the choice of participating in interscholastic sports, embraces certain customs, activities, and values that are unique to the athletic environment. Physical interaction among athletes is generally more commonplace among student athletes than among students in the general population, as exemplified by repeated and frequent use of communal showers and dressing rooms, the requirement of a yearly physical and in some instances, by the actual physical contact that is a part of the sports activity. These factors, again, in and of themselves, are not determinative, nor do they serve the purpose of negating privacy expectations.

In some sports, health and safety concerns are markedly enhanced by virtue of intense physical contact. In other interscholastic sports, although there exists little, if any, additional danger from physical contact, the activity may be expected to involve extreme situations of stress and intensity, both physical and mental.

Other activities in the school system also involve situations of risk in terms of health and safety. These activities are distinguishable from interscholastic sports. Some of these activities, such as chemistry, will involve danger but will not involve rapid movement, physical contact, or intense physical challange. Moreover, they are courses that, although perhaps not required, are part of the curriculum. Other activities, while more in the nature of compliments to the curriculum, such as driver's education, do involve one-to-one or similarly close supervision, and do not involve intense physical challenge. The evidence presented in relationship to intramural sports tended in the balance to indicate that those activities normally involve less intensity.

In addition to the findings related to the distinct character of interscholastic sports, it is this court's view that the school au-

thorities here have acted within their discretion in singling out student athletes for the proposed drug program, especially inasmuch as participation in interscholastic competition is not, as a matter of law, a constitutionally protected right.

These comments do not mean that the rights of student athletes are not constitutionally protected, nor that student athletes surrender their rights by choosing to participate in sports. Any program involving the drug testing of interscholastic athletes in the public school system must take into consideration the privacy, due process, and equal protection rights and interests of the athlete. No part of an established athletic program, including a drug program intended to apply to student athletes, will be allowed by law, for example, to discriminate on the basis of sex or on other constitutionally protected grounds. See, e.g., Sturrup v. Mahan, 261 Ind. 463, 305 N.E.2d 877 (1974), reversing Sturrup v. Mahan, 290 N.E.2d 64 (Ind. App.1972); Haas v. South Bend Comm. School Corp., 259 Ind. 515, 289 N.E.2d 495 (1972). No such program can ignore the privacy interest of a student athlete. The TSC program does not allow physical observation of the collection of specimens, and provides a system of protecting confidentiality. Due process rights must be protected. The TSC program provides for a hearing, and the worst of penalties results in deprivation of participation in sports, and only after repeated offenses.

Although non-observation of collection of specimens clearly raises some problems related to insuring reliable samples, the school has taken reasonable precautions against substitution of urine, by the use of dye in the toilet bowl, and by checking the general temperature at the time of collection. In the context of this case, the school officials reasonably chose to sacrifice some assurances in favor of sensitivity to the privacy interests of the student athletes.

In a similar policy-oriented vein, the plaintiffs contend that singling out athletes for testing constituted a violation of the Equal Protection Clause, inasmuch as other classes and activities involved similar dangers and health hazards. The evidence presented shows that participation in interscholastic sports presents unique health or safety risks for drug users. Even assuming this were not so, the school is within its authority, having shown reasons for so doing, to single out student athletes for this program.

The method of testing described by the school is adequate to satisfy due process concerns at this stage. To the credit of school officials, possible pitfalls involved in EMIT screening have been avoided, as much as possible, by TLC and GCMS followup. See, Wykoff v. Resig, 613 F.Supp. 1504, 1512–1513 (N.D.Ind.1985), affirmed by an unpublished order dated May 21, 1987 (holding that EMIT followed only by TLC was sufficient for a prison setting). If despite using state of the art techniques, human error results in a false positive reading from the program as applied, the student athlete has an opportunity to defend and explain at the school level. That method failing, the student athlete retains the right, under this holding, to appeal to the judicial system.

In this vein, the consent form does not operate to deny this right to the student. Although the consent will operate as notice of the program, and refusal will operate to bar the student from participation, it will not operate as a waiver of constitutional rights at the operational level. It will operate to allow the school to make use of the results in the limited manner described in the program.

The evidence in this case indicates that little, if anything, can be inferred relative to current impairment from the proposed program. See also, Anable v. Ford, 663 F.Supp. 149 (W.D.Ark.1985). In this court's view, detection of impairment need not be shown. The school is within its authority to insist on the absence of drug usage by its athletes upon the basis of the concerns presented here. The weight of evidence indicates that alternate means are far less effective, and that despite training, the detection of drug usage cannot be accomplished by observation. The evidence supports the conclusion that the program

is, on its face, a reasonable means of assuring a drug-free athletic program.

The TSC program is non-punitive in nature, and the penalties provided are reasonable. The worst consequence, which only happens in stages after repeated offenses, is denial of participation in an extracurricular, voluntary program which is unnecessary to fulfill any requirement of the state. Although there was testimony otherwise, on balance the experts agreed that some negative consequences, where properly applied, were an appropriate element of an effective drug program.

In relationship to the policy-oriented arguments of the plaintiffs, absent clear constitutional prohibitions, this court is unwilling to put itself in the shoes of duly selected officials, so as to decide policy questions properly left to their discretion.

## CONCLUSION

The processes of the Federal Judiciary under Article III of the Constitution of the United States work best when both legislative and administrative authorities are given a wide berth to deal with serious social problems. The First Harlan said so, dissenting in *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895), more than ninety years ago. Such large generalizations about the exercise of judicial power must be carefully refined in the context of a federal system that anticipates the exercise of legislative and administrative authority at federal, state and local levels involving both vertical and horizontal Federalism. The Second Harlan said no less:

> We are accustomed to speak of the Bill of Rights ... as the principal guarantee of personal liberty. Yet it would surely be shallow not to recognize that the structure of our political system accounts no less for the free society we have. The Framers staked their faith that liberty would prosper in the new nation not primarily upon declarations of

individual rights but upon the kind of government the Union was to have.[1]

Although the question is a close one, the record here does not justify imposing a prior judicial restraint on this written plan of the school board at this stage of the program. Certainly those students who are directly affected by an implemented version and who can successfully cross the standing bridge, may mount such constitutional challenge as may be appropriate under the factual circumstances then and there prevailing. Such an attack may well include a challenge to the procedures related to the control and integrity of specimens.

Understanding what *may* happen in the future, the present record does not compel this court to sound the constitutional death knell to this written program while it is in limbo between the drawing board and actual execution.

As a final matter, on December 22, 1987, the plaintiffs filed a motion to reopen the record in this case, contending that the defendants concealed evidence favorable to their cause. It is alleged that Mr. Burton knew of opposition to the drug program and concealed names of opposing coaches from the plaintiffs. This court has carefully examined these allegations and the nature of the testimony which the plaintiffs desired to add to the record. This court will indulge the *factual* assertions in this regard in a light favorable to the plaintiffs.

Because the court views the proposed evidence as either cumulative or non-determinative of constitutionality, the MOTION TO REOPEN is DENIED. The plaintiffs' request for declaratory and injunctive relief is likewise DENIED. Costs assessed against the plaintiffs. Judgment shall be entered accordingly. SO ORDERED.

---

1. John Marshall Harlan, "The Bill of Rights and the Constitution," an address at the dedication of the Bill of Rights Room, U.S. Subtreasury Building, New York City, August 9, 1964. See also, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).